Evan T.L. Hughes, Esquire  
Hughes Firm, LLC  
One Penn Center  
1617 JFK Blvd., Suite 2006  
Philadelphia, PA 19103  
Tel. 215.454.6680  
evan.hughes@hughesfirm.pro

Attorney for Defendant

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TROY WRAGG | UNITED STATES DISTRICT COURT<br>FOR THE EASTERN DISTRICT<br>OF PENNSYLVANIA<br><br>CRIMINAL DOCKET<br><br>2:15-CR-00398-JHS-1<br><br>2:18-CR-00465-JHS |

**TROY WRAGG'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

Movant, Troy Wragg, through undersigned counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and order the remainder of his sentence of confinement to either be reduced to time served, or in the alternative, to be modified and served on home confinement followed by supervised release. This motion should be granted due to the "extraordinary and compelling reasons" confronting the federal prison system by the pandemic of COVID-19 and the fact that Mr. Wragg is in a high-risk COVID-19 category based on pre-existing medical conditions; is not a danger to the community; and further because respect for the law and general deterrence, and other notable Section 3553(a) factors, would not be undermined by converting the remainder of his sentence to home confinement and allowing him to shelter at home, given the cataclysmic events of the current pandemic. We respectfully ask the Court to consider this motion on an expedited basis as each day in custody brings renewed and unthinkable risk to Mr. Wragg's life.

## BACKGROUND

Mr. Wragg was convicted by a plea of guilty to conspiracy and wire fraud, the Court sentenced Mr. Wragg, a first- time offender, to 264 months of imprisonment, restitution in the amount of $54,531,488.57, and 5 years of supervised release (See Ex. A and Ex. B), for these non-violent offenses. Mr. Wragg (inmate register number 67165-019), has been in custody for approximately 18 months and is currently housed at FCI Ft. Dix on July 22, his current release date is August 7, 2037.  Prior to the filing of this motion, Mr. Wragg filed an administrative relief request with FCI Ft. Dix likewise seeking compassionate release on the same grounds as submitted herein which was denied on April 17, 2020, thereby exhausting the possibility of relief from the BOP. (Ex. C).

## ARGUMENT

Troy Wragg is a first-time offender sentenced by this Court to 264 months of incarceration. Now, however, because of the unthinkable spread of a global pandemic that is disproportionately impacting and killing persons of weakened physical conditions such as Mr. Wragg, and exacerbated by his mental health conditions, he faces a serious risk of dying in prison if infected (Ex. D-Letter from Dr. Jones). *See also* "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12– March 16, 2020," Centers for Disease Control and Prevention Report (March 18, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm. ("a majority of coronavirus disease 2019 (COVID-19) deaths have occurred among adults aged ≥60 years and among persons with serious underlying health conditions.").

This unparalleled health crisis in our country and its deadly arrival in our prisons present "extraordinary and compelling reasons" to grant Mr. Wragg's motion. As explained below, FCI Ft. Dix is already overcrowded—beyond recommended capacity—and the conditions there make it impossible for Mr. Wragg to self-care and prevent his infection at the facility. I am informed by Mr. Wragg and three other inmates at the facility, that more than seventy inmates have been found to be infected there by the virus in the last two weeks. Unfortunately, "social distancing" is not an option for most of our federal inmates. *The New York Times* recently explained why jails are a much more dangerous place to be than even a cruise ship. *See* "An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues," *The New York Times* (March 16, 2020), available at
https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

SERIOUS MEDICAL CONSIDERATIONS FOR MR. WRAGG

Mr. Wragg relates to counsel that there is no hand sanitizer available to the inmates and that soap is rationed and in short supply, and that the purchasing of soap has been difficult through the inmate commissary also due to supply shortages.  Moreover, Mr. Wragg reports conditions that are so unsanitary that he and his fellow inmates clean the floors with shampoo in hopes of protecting themselves from infection.  Mr. Wragg also reports dangerously insufficient access to personal protective equipment such as protective masks that are recommended by the CDC that are critical in preventing the spread of the virus and which are mandatory in many parts of the country.  Only recently have face masks been provided to inmates and what is being provided - single use masks - only once a week- is insufficient pursuant to CDC guidelines. *See Use of Cloth Face Coverings to Help Slow the Spread of COVID-19, available at*

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html.

The grave danger caused by COVID-19 is further amplified by a pattern of serious medical neglect by the Federal BOP, which has been well documented. (See Exhibit E- Troy Wragg BOP Medical Timeline).  Even prior to his November 9, 2018 incarceration he was in and out of the hospital five (5) times in 2018 alone.  In January 2019, while at FDC Philadelphia, Mr. Wragg had a severe grand-mal seizure that led to a broken wrist (Ex. E).  On January 23, 2020, shortly before the COVID-19 outbreak and lockdown of all BOP facilities, Mr. Wragg went to Health Services on a "Inmate Sick Call" request given a series of very serious, and witnessed, grand-mal seizures.  His medication was increased to the highest level the BOP will administer of Keppra, which is 3,000mg per day.  Id.

Additionally, Mr. Wragg's weight is of serious concern as well.  At 5'8, he weighed in last at 222 pounds giving him a 33.8 BMI, which is listed as a top five CDC COVID-19 risk factor.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html  Mr. Wragg's weight has increased dramatically, he reports gaining seventeen pounds in less than one week when he was put on a new medication.  The risk factors given by the CDC clearly state that anyone with a BMI of 31 or greater is at a heightened risk to both contract and die from COVID-19. Id.

On March 21, 2020, Mr. Wragg began having additional seizures and reports not receiving the proper dosage of his medicine, which had been updated in January, less than two months prior.  Mr. Wragg put in several electronic inmate requests to staff, two of which were responded to by the Assistant

Warden Smith at FCI Fort Dix.  The responses did not come until four (4) days later, and even still the medicine issue was not resolved.  This started a series of violent cluster seizures that has now resulted in Mr. Wragg having 15 seizures in a 21 day time period.  A Counselor of Mr. Wragg, and an on-duty CO in building 5812 (West Compound of FCI Fort Dix) both made calls on Mr. Wragg's behalf. In the incident with the CO calling the on-call Doctor (who also happens to be the doctor assigned to Mr. Wragg for his incarceration) she stated that the Keppra will eventually work after a few days and the seizures will stop.  Given the severity of even one seizure, an MRI and blood work, and hospitalization are warranted and not mere patience.

Eventually, his medicine issue was resolved, however, the seizures did not stop, and he was not seen by a doctor.  All of these seizures were witnessed by several other people (see Exhibit F for affidavits of inmate witnesses who helped Mr. Wragg).  Mr. Wragg put in three (3) "Inmate Sick Call" requests with no response.  The seizures continued.  It was not until Mr. Wragg was in contact with the ACLU and provided a full declaration (see Exhibit G) of his medical crisis that he was ever seen by Health Services.  Even when he was seen by Health Services he was seen by a PA who would not increase the Keppra dosage, and he put Mr. Wragg on a medication he was previously on, and to which he had a negative reaction and inturn causing more seizures.  Finally, on March 8, 2020 (5 days ago), Mr. Wragg was seen by the medical doctor at FCI Fort Dix.  Mr. Wragg was prescribed yet another medication and ordered more medicine as an emergency to refill his Keppra given that he was out of it from taking more of it given the seizures that were painfully wearing Mr. Wragg down to a shell of a human-being who has often times not been able to get out of bed without assistance.  Even with this meeting with the doctor, he did not receive his primary seizure medication (Keppra) until yesterday, May 12, 2020.  It was too little, too late, as Mr. Wragg suffered two serious, violent, and severe grand-mal seizures that lasted twice as long as a standard grand-mal seizure (approximately 45-50 seconds) and left Mr. Wragg unable to move for several hours while being cared for by another inmate.

Mr. Wragg is terrified to go to Health Services again given he was told by a staff member that "if he goes out of the compound to the hospital, he will be put in quarantine with inmates who may have COVID-19 symptoms." As stated by Dr. Jones Mr. Wragg has uncontrollable severe epilepsy and he is at risk of dying from seizures and secondarily given COVID-19.  This is truly a matter of life or death for Mr. Wragg. Given the high-degree of new COVID-19 cases at FCI Fort Dix combined with his hypertension (his most recent blood pressure, even on medication, was 167/85 with a pulse between 110

and 136), epilepsy, and other medical conditions Mr. Wragg is too weak to fight off even a common cold at this point, let alone the deadly COVID-19 virus.

ADDITIONAL SPECIAL CONSIDERATIONS FOR MR. WRAGG

As shown in his Release Plan (See Exhibit H) Mr. Wragg has a stable home in rural Maryland (428 Harford Street, Perryville, MD 21903) where his wife is a valued member of the community with absolutely no criminal record or misconduct.  His wife, Megan Hallett Wragg, teaches High School English, she recently obtained her Masters Degree in Classroom Technology with a 4.0 from LaSalle University, she is on several committees, and, just yesterday May 12, 2020, she was recommended for a promotion to "Lead Teacher" of the entire English Department at Perryville High School in Perryville, Maryland.  Mr. Wragg's wife is his biggest supporter and best friend.  I am including all of this for special consideration given that Mr. Wragg is not just going back to a standard home - he is going back home to a highly loving, supportive, stable, and well-respected home.  Mr. Wragg and Mrs. Hallett Wragg rent their home and have lived in the same home for 2 years.  Their landlord, Will Sickels stands ready to verify his amenability to having Mr. Wragg on house arrest there.  He is an advocate and friend to both Mr. Wragg and his wife.  Rent is always paid on time, even despite this global crisis, as Mr. Wragg's wife has a consistent salaried and tenured job as a teacher.

When Mr. Wragg was sentenced to 264 months in prison on August 20, 2019, Your Honor recommended he be placed in a BOP Medical Facility given his recognized health conditions.  The BOP did not comply and placed him at FCI Fort Dix, given it is close to his home.  Mr. Wragg and his wife made the best of it and Mrs. Hallett Wragg visited my client almost every single weekend and on all major holidays.  Mrs. Hallett Wragg can tell you that prior to visitation being locked down, ever since the cluster seizures that occurred in January of 2020 (referenced earlier) that her husband, my client, Mr. Wragg has not been the same. She noted then, pre-COVID-19, how he was already in a highly weakened state and was suffering from depression and anxiety on top of all of his other serious medical ailments.

Furthermore, we request that the court take into consideration the fact that Mr. Wragg has received no disciplinary infractions while at FCI Fort Dix, that he works as a teacher of ACE classes, and has never failed a BOP or Pre-Trial breathalyzer or urine analysis showing despite his previous addiction

to alcohol and medical and health conditions he has made significant efforts to combat alcohol abuse.

When the Court turns its focus to the Section 3553(a) factors, Mr. Wragg, is not a violent offender and is not a danger to the community.  To the extent that the Court feels that Mr. Wragg is at risk of committing further financial crime from the confines of his home, there are a multitude of monitoring solutions available to the court that include internet access restrictions, financial reporting, and regular reporting to a probation officer that are sufficient to protect the public without risking Mr. Wragg's life in the process.  The Court has already addressed the seriousness of the crime and the need for deterrence in its original sentence, however, that sentence was imposed in a very different context when the Bureau of Prisons was more able to provide a safe and humane environment for the housing and rehabilitation of Mr. Wragg which is no longer possible.  Surely, the Court did not have to consider the grave danger that the sentence would create given the new realities of this pandemic. It is respectfully submitted that the humane and compassionate thing to do is to either reduce Mr. Wragg's sentence to time served, or in the alternative, to convert Mr. Wragg's sentence to home confinement and supervised release for the remainder of its term up until his expected release date of August 7, 2037.

## I. THIS COURT HAS AUTHORITY TO RESENTENCE MR. WRAGG UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT.

While Mr. Wragg has already exhausted his sole avenue of relief with the BOP, that is not necessary for this court to take action. With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. §3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children. USSG Section 1B1.13, provides that a Court may reduce a term of imprisonment if three conditions are met: 1) extraordinary and compelling reasons warrant the reduction; id. §1B1.113(1)(A); 2) the defendant is not a danger to the safety of any person or to the community, as provided in 18 USC Section 3142(g),

id. Section 1B1.13(2); and (3 the reduction is consistent with this policy statement, id. USSG Section 1B1.13, Application Note 1(A).

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. Id.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). But the legislative history to the statute gives an indication of how Congress thought the statute should be employed by the federal courts. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction ...

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," id. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." Id. Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Id. (emphasis added).

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for

sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission took considerable time to promulgate its policy in response to Congress's directive. It finally acted in 2007, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A). However, this guidance did little to spur the BOP to file on behalf of prisoners who might have met these general standards. After a negative Department of Justice Inspector General report found that the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission felt compelled to act again. See U.S. Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006 (Apr. 2013). The Commission amended its policy statement on "compassionate release" in November 2016. See U.S.S.G. § 1B1.13 Amend. (11/1/2016). In addition to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for its past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G. § 1B1.13. See U.S.S.G. § 1B1.13, n.4; see also United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the history of the BOP, DOJ and Commission's interplay in developing guidance for "compassionate release" motions). Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing.Id., n.1(A) (including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."). *But see United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that, given the changes to the compassionate release statute by the First Step Act, U.S.S.G. § 1B1.13, application note 1(D) "no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582."); United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); United States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP finds they are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"); but see

United States v. Lynn, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) (holding that application note 1(D)governs compassionate release reductions of sentence and federal judges have no authority to create their own criteria for what constitutes an "extraordinary and compelling" reason for resentencing).

The Commission's actions, however, did little to change the dearth of filings by the BOP on behalf of inmates who satisfied the Commission's general guidance. During the more than three decades during which the BOP was the exclusive gatekeeper for "compassionate release" motions, very little effort was made to implement Congress's intention to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

Finally, this changed with the passage of the First Step Act in 2018. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant," after the inmate exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for it to be made by the BOP.

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if a resentencing court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors. *Id.* Resentencing courts are also advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

## II. THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR MR. WRAGG, WHO IS A HIGHER-RISK FATALITY PATIENT

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic. See "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS. As of May 12, 2020,

COVID-19 has infected at least 4.18M persons worldwide, leading to at least 286,000 deaths. In the United States, approximately 1.38M have been infected, leading to at least 286,000 deaths.

On March 13, 2020, the White House declared a national emergency, under Section 319 of the Public Health Service Act, 42 U.S.C. §247(d)). See The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

On March 16, 2020, the White House issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed. See Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," New York Times (March 17, 2020), available at: www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html

Although only seventy confirmed cases had been reported in the United States at the beginning of March 2020, as of March 26, 2020, 38,987 cases have been identified in New York State alone, see Mitch Smith, et al., Tracking Every Coronavirus Case in the U.S.: Latest Map and Case Count, N.Y. Times, March 27, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, and 23,112 of those confirmed cases are in New York City. See Bromwich, et al., 365 Dead from Coronavirus in N.Y.C.: Live Updates, N.Y. Times, March 27, 2020, https://www.nytimes.com/2020/03/27/nyregion/coronavirus-new-york-update.html. "So far, 20 percent of the people who tested positive in New York City have required hospitalization[.]" Id.

As of May 12, 2020 the virus has penetrated nearly every corner of the globe at over 4.23M cases worldwide and 1.39M cases in the United States and has caused particular carnage and death in confined spaces such as nursing homes and jails.

The Centers for Disease Control and Prevention states that "[t]he virus is thought to spread mainly from person-to-person" "[b]etween people who are in close contact with one another (within about 6 feet)", "[t]hrough respiratory droplets produced when an infected person coughs or sneezes" and "[i]t may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes[.]" Coronavirus Disease 2019

(COVID-19), How Coronavirus Spreads, Centers for Disease Control and Prevention, March 4, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

Courts have acknowledged that "inmates may be at a heightened risk of contracting COVID-19" due to the circumstances of confinement. See, e.g., United States of Am., v. Dante Stephens, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (citing Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910). These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand. New York has been labeled the new "epicenter" of the pandemic worldwide. New York health officials estimate that the number of hospitalizations in New York State will double every two days over the course of the next two to three weeks. New York's cases of COVID-19 now represent 7 percent of the cases worldwide and is growing exponentially.

It is significant that on March 26, 2020 the Office of the Attorney General issued a directive to the Director of the Bureau of Prisons recognizing that "there are some "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement where appropriate, to protect the health and safety of BOP personnel and the people in custody." (Ex. C) (emphasis added).

The Memorandum further sets forth various criteria for release to home confinement, all of which favorably apply to Mr. Wragg's request:

° Giving priority to inmates in low and minimum-security facilities.

° The inmate's conduct in prison – excluding violent or gang-related activity from Consideration.

° The inmate's PATTERN score. Mr. Wragg is eligible for First Step Act benefits and is designated as a low risk of recidivism.

° Mr. Wragg has a verifiable re-entry plan to prevent recidivism and to that end will reside at home thus maximizing public safety issues.

° His crime of conviction is non-violent and he poses no risk of danger to the community.

### III. THE CONDITIONS OF BOP INCARCERATION FOSTER THE SPREAD OF COVID-19, AND MR. WRAGG'S PREEXISTING CONDITIONS RENDER HIM PARTICULARLY SUSCEPTIBLE TO AN UNREASONABLE RISK OF DEATH AND AN INABILITY TO TAKE PREVENTATIVE MEASURES OR SELF-CARE RECOMMENDED BY THE CDC.

With New York at the "epicenter" of the COVID-19 pandemic, it was only a matter of time before COVID-19 finds its way more dramatically into FCI Ft. Dix, where Mr. Wragg is housed. Indeed, counsel was informed today by Mr. Wragg that inmates in the unit where he sleeps were diagnosed with COVID-19 and removed from the unit. Further, the disease already has spread widely in Burlington County, New Jersey, where Ft. Dix is located with total cases counted reaching 3,577 as of May 11, 2020.

Conditions of confinement at FCI Ft. Dix create an optimal environment for the transmission of contagious disease. *See* Joseph A. Bick, "Infection Control in Jails and Prisons," Clinical Infectious Diseases 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910.  People who work in the facility leave and return daily; people deliver supplies to the facility daily; inmates were having social, legal and medical visits regularly after the initial spread of the virus prior to the BOP's decision to stop visits for 30 days on March 13, 2020.  Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," and "infection control is challenging in these settings." *See* "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

Mr. Wragg is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. He cannot self-quarantine or partake in "social distancing" in his prison facility. He is housed in a community dormitory environment that beds numerous inmates together. There are also community spaces where inmates and prison staff gather, often hundreds at a time, including a common room, laundry facilities, barber shop, medical areas, dining hall, small library and gym.

These high-density areas are precisely the kind of spaces that have caused the alarmingly high-

spread rates of COVID-19 in New York City.  Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," ABA Journal (March 13, 2020), available at: https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

 Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease. See Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," NPR (March 13, 2020), available at: https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.  The Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.  Courts are beginning to recognize the risk as well. On March 18, 2020, in United States v. Stephens, 15-cr-95 (AJN) (S.D.N.Y. Mar. 18, 2020), the Court granted the defendant's emergency motion for reconsideration of the denial of bail and ordered the defendant released with conditions. See id., Doc. 2798. The Court noted "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" and the "heightened risks" inmates face "of contracting COVID-19 should an outbreak develop." Id. at 2. (citing Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047 (Oct. 2007). Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of non-violent, elderly inmates. *See  Letter of Representatives Jerrold Nadler and Karen Bass* (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

Brie Williams, M.D., Professor of Law at the University of California, San Francisco, in the Geriatric Division, has submitted an affidavit in support of Mr. Wragg's release. According to Dr. Williams, the risk of infection and accelerated transmission of COVID-19 in prisons is

extraordinarily high, particularly for older inmates. Id. ¶ 5-8. Dr. Williams further avers that social distancing is "virtually impossible," due to crowding and the lack of necessary sanitation. Id. ¶7. Dr. Williams' affidavit is attached at Exhibit I.

Mr. Wragg is 38 years old. Despite his younger age he suffers from a severely weakened immune system.  His wife, Megan, advises counsel that he has always been prone to sickness and respiratory infection such as coughing and sore throats and has always been particularly susceptible to the flu. Additionally, he is diagnosed with severe uncontrolled Epilepsy which puts Mr. Wragg in a greatly weakened state post-seizure episode.  This weakened and highly susceptible condition is supported by the attached medical report from Dr. Brittny Jones, M.D., Medical Director of Behavioral Health at Christina Care Hospital, who has retreated Mr. Wragg extensively for his Eplipsey and mental health illnessnesses. In her May 6, 2020 letter attached, Dr. Jones states that Mr. Wragg is **"at heightened risk of death secondary to his medical conditions."** There is no dispute that should Mr. Wragg contract COVID-19, these conditions place him at a much higher risk of serious with far more serious complications than the general public. The factors, including his psychiatric conditions and resulting physical weakness, are compelling and extraordinary circumstances supporting compassionate release at this unique time in this country's history. There is an urgent need to act now, before the virus spreads further within the prison and Mr. Wragg becomes infected.

In summary, the COVID-19 virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to Troy Wragg. The conditions at FCI Ft. Dix do not allow Mr. Wragg to take the self-care measures required by the CDC to protect his safety.

### IV.     THE RELEVANT § 3553(a) FACTORS, INCLUDING MR. WRAGG'S RELEASE PLAN, FAVOR RESENTENCING

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

In this case, a review of the Section 3553(a) factors, and Mr. Wragg's release plan of supervisory release and home confinement under electronic G.P.S. monitoring for the remainder of his unserved original term of imprisonment, favor granting Mr. Wragg's compassionate release.

First, Mr. Wragg's offense conduct, while concededly serious, involved no violence.  Mr. Wragg's precarious health present reasons combined with the COVID-19 crisis for the Court to conclude that his current personal history and characteristics favor resentencing under the Section 3553(a) factors.

While conceding that Mr. Wragg's offense conduct was serious, his lack of criminal history prior to the instant offense and his nonviolent nature weigh in favor of resentencing. The government cannot dispute the serious physical danger created by the current pandemic to someone with Mr. Wragg's conditions. It also cannot guarantee or provide any sense of confidence that this widespread virus will not further worsen at FCI Ft. Dix. If the virus further spreads inside that prison, as it surely will do it likely would kill Mr. Wragg. This Court never intended to impose such a risk at the time of Mr. Wragg's original sentencing.

It is respectfully submitted that as part of Mr. Wragg's continued punishment in this case that the Court convert the remaining period of his expected term of imprisonment, to strict home detention as a condition of supervised release. In this way, Mr. Wragg continues to face confinement as a measure of due punishment, but without the serious risk to his physical health.  Similar relief has been granted by courts recently in the Eastern District of Virgina in *USA v. Paul Manafort, Jr.* 18-CR-83.  In this well-publicised case, the defendant was sentenced to a lengthy term of incarceration, served less than fifty- percent of his sentence, and was resentenced to serve the remainder of his sentence on house arrest because of the risk of death posed by his poor health conditions and the COID-19 virus.

The recently amended compassionate release statute, at § 3582(c)(1)(A), authorizes the Court to extend supervised release in this way. See 18 U.S.C. § 3582(c)(1)(A) (the court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment"). Such a prolonged period of home confinement will meet Section 3553(a)'s purpose to give due respect for the law and to acknowledge the seriousness of the offense.

Congress's expansion of the compassionate release statute by § 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review. The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent. The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment.

Significantly, courts weighing § 3553(a) factors have granted release to defendants with

convictions for serious crimes and with histories of violence, finding that changed health circumstances, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate public safety concerns.

In the recent case of United States v. Damian Campagna, 2020 WL 1489829 (S.D.N.Y. filed March 27, 2020), the Court granted the defendant's application, based upon his health and the fear COVID-19 would spread to have the balance of his sentence reduced to allow him to immediately transfer to home incarceration. In United States v. Bailey, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder. Bailey, No. 94-cr-481 (N.D. Ill. July 24, 2019) (slip op. at 1). The parties agreed that the defendant, who was almost 90 years old and suffered from multiple health issues, had satisfied the statutory requirements for compassionate release.

However, the government opposed release under the Section 3553(a) factors due to the "reprehensible nature of the offense." The court acknowledged that the defendant's criminal history and serious offense conduct supported a denial of the requested reduced sentence. However the court weighed the more recent factors in the defendant's favor, including his institutional adjustment, lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction[ ]." Id. In weighing these more recent favorable factors over the defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. Id. at 2.

In a District of Oregon case, the court likewise granted compassionate release to a defendant, who also was serving a 30-year sentence for leading a "major drug conspiracy." United States v. Spears, No. 3:98-Cr.-208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019). As explained in the court's opinion granting release, the defendant's history included crimes of violence, his performance on supervised release had been poor, and he committed the last serious offense for which he was serving imprisonment when he was in his fifties. Id. at *4.

Despite these findings, the district court found that the defendant was now 76 years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." Id. at *1. Although the government persisted that the defendant remained dangerous, the Court disagreed. The Court concluded that, in light of the defendant's strong family support, the age of his prior convictions,

and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide sufficient specific deterrence. Id. at 5.

Similarly, in United States v. McGraw, No. 02 Cr. 18 (LJM-CMM), 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of U.S.S.G. § 1B1.13. The defendant, who was approximately 55 years old at the time of the offense, was 72 years old at the time of the court's release opinion and suffered from limited mobility, diabetes, and chronic kidney disease. Id. at *2. The government argued that the defendant remained a danger to the community because of his leadership in a notorious motorcycle gang, noting that he could continue his criminal activity with simple access to a telephone. Id. at *4. The court, however, concluded that given the defendant's frail health, his positive record at the institution, and the ability of the court to impose conditions that would reasonable assure the safety of the community upon release, the more flexible compassionate release statute, as amended by the First Step Act, favored granting the defendant's motion. Id. With respect to the Section 3553(a) factors, the court concluded that the "significant sanction" the defendant had already served was sufficient:

> But further incarceration is not needed to deter Mr. McGraw from further offenses; nor for reasons described above, is it necessary to protect the public from future crimes. Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

Id. at *5. The court imposed lifetime supervision to "continue to serve as a sanction and general deterrent, appropriately recognizing the seriousness of Mr. McGraw's conduct." Id. at *4.

As amplified in the cited cases above, release of Mr. Wragg, who suffers from Epilepsy, a resulting weakened immune system, and therefore infection prone when sick, presents serious and diagnosed conditions that under the current extraordinary and compelling circumstances of the threat of a novel contagion contaminating the prison would not serve to diminish the seriousness of the offense of

conviction, but would fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review.

Mr. Wragg's health conditions and the rapidly advancing COVID-19 outbreak, together with the prison's inflexibility to give Mr. Wragg the ability to take self-care measures directed by the CDC to remain safe during the outbreak, warrant a reduced sentence in his case. This is particularly so given the March 26, 2020 directive from Attorney General Barr's Office.

## CONCLUSION

Mr. Wragg should be granted Compassionate Release. Mr. Wragg urgently needs to be released to home where he can be in a more secure environment in which social distancing is possible and in which he is able to see the medical professionals who know his unique medical conditions and can help him get the attention that he needs in order to protect his health.

Notwithstanding his poor physical health, Mr. Wragg has demonstrated efforts toward rehabilitation as a teacher of ACE Classesand other programs at FCI Ft. Dix. He has been a model inmate and has stayed away from drugs, alcohol, and contraband, and he has utilized the last 18.5 months of incarcerated time to think, reflect, and repent. Mr. Wragg has demonstrated many viable re-entry skills that translate to a positive reentry to society. He has a safe and loving home, wife, and community to return to whether it be under the conditions of home confinement or community supervision. Also, his town has one of the lowest rates of COVID-19 infection in the state of Maryland.

It is respectfully requested that you grant this Compassionate Release for Mr. Wragg as it is necessary to save his life.

Respectfully submitted,

/S/

_____

EVAN T.L. HUGHES, ESQ.

## **VERIFICATION**

All statements and factual assertions made herein are made to Counsel's good-faith based information and belief, and are made subject to penalty of perjury.

/S/

Dated: May 13, 2020        _____

Evan T.L. Hughes, Esquire

**CERTIFICATE OF SERVICE**

The forgoing motion for compassionate release was served by way of ECF on the date indicated below.

/S/

Dated: May 13, 2020          _____

Evan T.L. Hughes, Esquire