IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

TROY WRAGG,

　　　　　　　　　Defendant.

CRIMINAL ACTION
NO. 18-465

## ORDER

**AND NOW**, this 19th day of November 2020, in accordance with the Opinion and Order dated July 16, 2020 denying Defendant's Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A) (Crim. No. 15-398, Doc. Nos. 307, 308) and the Order entered on November 18, 2020 denying Defendant's Emergency Motion for Compassionate Release (Crim. No. 15-398, Doc. No. 329), it is **ORDERED** that the Opinion and Order dated July 16, 2020 and the November 18, 2020 Order (Doc. Nos. 307, 308, 329 in Crim. No. 15-398) are incorporated into Crim. Doc. 18-465 and that Defendant's Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 26) and Defendant's Emergency Motion for Compassionate Release (Doc. No. 41) are **DENIED**.

BY THE COURT:


/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TROY WRAGG,<br><br>                 Defendant. | CRIMINAL ACTION<br>NO. 15-398 |

## OPINION

**Slomsky, J.**                                                            **July 16, 2020**

## I.      INTRODUCTION

Before the Court is Defendant Troy Wragg's Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 300.)  He is currently serving a 22-year sentence for wire fraud, securities fraud, and conspiracy at the Federal Correctional Institution at Fort Dix, New Jersey ("FCI Ft. Dix"), and now seeks compassionate release from incarceration due to concerns over the recent COVID-19 pandemic and its potential effect on his underlying health conditions.  The Government opposes the Motion on the grounds that Defendant has exaggerated the severity of his medical conditions, has only served a small portion of his sentence, and would continue to be a danger to the community if released.  (Doc. No. 302 at 1-2.)  For the reasons that follow, Defendant's Motion for Compassionate Release will be denied.

## II.      BACKGROUND

On September 2, 2015, a grand jury returned an Indictment (Doc. No. 1) charging Defendant with the following offenses:

1)  Conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 (Count I);

2)  Wire fraud, in violation of 18 U.S.C. § 1343 (Counts II-VIII);

3)  Conspiracy to engage in securities fraud, in violation of 18 U.S.C. § 371 (Count IX); and

1

              4)  Securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (Count X).

(Doc. No. 1.)

From March 1, 2005 to April 30, 2010, Defendant was the leader of the Mantria Ponzi scheme, reported, among other things, to be the "largest green energy fraud in United States history." (Doc. Nos. 1, 291.) Along with his two co-conspirators, Defendant stole over $54 million and devastated financially the lives of several hundred victims. (Doc. No. 291 at 1.) Defendant advertised Mantria Corporation as a real estate and "green energy products" business venture and promised to reward investors with returns as high as 484%. (Id. at 3). In reality, Mantria essentially had no earnings or profits, and Defendant and his co-conspirators made "materially false statements and omitted material facts to mislead investors as to the true financial status" of the company. (Doc. No. 1 at 5, ¶¶ 10-11.) Defendant kept this scheme alive by paying early investors with funds received from new investors. (Id.) In 2009, the pyramid scheme collapsed, and Defendant's fraudulent activity was exposed. (Doc. No. 291 at 4.) As a result, many of the victims of the scheme lost their entire life savings, retirement funds, and even homes. (Id. at 1.)

On March 2, 2017, Defendant appeared before the Court and pled guilty to all ten counts of wire fraud, securities fraud, and conspiracy. (Doc. No. 94.) On October 24, 2018, the Government filed an Information alleging Defendant's involvement in a second wire fraud scheme that occurred while he was on pretrial release for his initial offenses. (Doc. No. 232 at 1.) On October 28, 2018, Defendant pled guilty to the additional count of wire fraud. (Doc. No. 300, Ex. A.) On August 20, 2019, the Court sentenced Defendant in both cases to 264 months imprisonment, five years of supervised release, and to pay $54,531,488.57 in restitution. (Id. at Ex. A, Ex. B.)

On March 23, 2020, Defendant filed a request with the Warden of FCI Ft. Dix asking the BOP to file a Motion for Compassionate Release on his behalf. (Id. at 90.) On April 17, 2020, the BOP denied Defendant's request. (See id. at Ex. C.)

On May 13, 2020, Defendant filed the instant Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A), requesting that this Court order the remainder of his sentence be served on home confinement or reduce his sentence to time served.[1] (Id. at 1.) Defendant avers that he is a good candidate for compassionate release given his medical history, the BOP's response to COVID-19, and his personal characteristics. (Id. at 2, 3.)

First, Defendant contends his medical conditions present the requisite "extraordinary and compelling reasons" to warrant his release from federal custody. (Id. at 2.) Defendant claims to suffer from mental health illnesses, including Major Depressive Disorder, from a "severely weakened immune system" making him susceptible to the flu, and from hypertension and "severe uncontrolled Epilepsy." (Id. at 5, 14.) He argues that both his physical and psychiatric conditions put him at risk of "far more serious complications than the general public," should he contract the COVID-19 virus. (Id.) Along with his Motion, Defendant also submitted a letter from Dr. Brittni Jones, M.D., Medical Director of Behavior Health at Christina Care Hospital, who treated Defendant before his incarceration. (Id. at 59, Ex. D.) In the letter, Dr. Jones advised that Defendant "could be at a heightened risk of death secondary to his medical conditions," and warned of his "significant history of suicide attempts, including drinking bleach and not taking his seizure medication in order to kill himself via grand mal seizure." (Id.)

---

[1] Defendant also filed a pro se letter with the Court on May 8, 2020, seeking Compassionate Release on the same grounds that his counsel relied on in the present motion. (Doc. No. 298.)

Second, Defendant asserts that the BOP is unqualified to adequately handle his medical needs to assure his safety during the pandemic and has failed to implement the necessary procedures to combat the spread of the coronavirus.  (<u>Id.</u> at 2-3.)  He describes his housing conditions inside FCI Ft. Dix as overcrowded, where sometimes hundreds of inmates are packed together in community spaces, and he claims that "social distancing is not an option."  (<u>Id.</u> at 2, 12.)  According to Defendant, there is no hand sanitizer available to inmates, "soap is rationed and in short supply," and inmates use shampoo to clean the floors to prevent the spread of disease.  (<u>Id.</u> at 3.)  And although the use of face-coverings has recently been implemented at FCI Ft. Dix, Defendant avers that inmates are provided with a single-use mask once a week.  (<u>Id.</u>)

Defendant also asserts that his medical needs have been neglected by BOP Health Services.  (<u>Id.</u>)  According to Defendant's personally prepared Medical Timeline (Exhibit E), he experienced a severe grand-mal seizure in January of 2019 that resulted in a broken wrist.[2]  (<u>Id.</u>)  In January 2020, Defendant's grand-mal seizures became more frequent, and as a result, the BOP increased his seizure medication, Keppra, to the highest level permitted.  (<u>Id.</u>)  Beginning on March 21, 2020, Defendant reported experiencing fifteen seizures in a period of twenty-one days.  (<u>Id.</u> at 4.)  He claims that his seizures increased in frequency because he was not administered the proper dosage, and when he put in several requests to prison staff for more medicine, he did not receive a response for four days.  (<u>Id.</u>)  Even after he received his medicine, Defendant alleges that his seizures did not stop, and he was continually ignored by prison staff after making three "Inmate Sick Call" requests.  (<u>Id.</u>)  On March 8, 2020, Defendant states he was examined by a medical doctor who

---

[2]   Defendant's BOP medical records show that on July 23, 2019, Defendant had his left wrist x-rayed.  During the exam, Defendant claimed that he hit his wrist on his bunk bed during a seizure that took place in March 2019, not January 2019.  (Doc. No. 303. at 110.)  The imaging results reported no acute fracture, dislocation, or soft tissue swelling, and the "joint space was intact."  (<u>Id.</u> at 112.)

prescribed more seizure medication. (Id.) However, between March 8, 2020 and May 12, 2020, when Defendant received the medication, he claims that he had two more severe grand-mal seizures that each lasted approximately 45-50 seconds. (Id.)

Third, Defendant claims his release to home confinement would be appropriate in light of the Section 3553(a) sentencing factors.[3] (Id. at 14.) He asserts that his crimes are non-violent, that he has no criminal history prior to the instant offenses, and that he has received no disciplinary infractions while incarcerated at FCI Ft. Dix. (Id. at 5, 15.) Defendant further argues that modifying his sentence to strict home confinement would adequately serve as "due punishment" for his offenses and would properly acknowledge the seriousness of his crimes, while affording due respect for the law. (Id. at 15.) If released to home confinement, Defendant plans to go back to a "highly loving, stable, and well-respected home" and live with his wife, Megan Hallett Wragg, who is a tenured high school teacher with no criminal record. (Id. at 5.)

---

[3]   When modifying a sentence under 18 U.S.C. § 3582(c)(1)(A), a court must consider the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    b. to afford adequate deterrence to criminal conduct;
>    c. to protect the public from further crimes of the defendant; and
>    d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>    . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

On May 22, 2020, Defendant filed a Supplement to his Motion for Compassionate Release (Doc. No. 301), providing the Court with his updated health status. According to counsel, Defendant's number of seizures increased from fifteen to twenty-six in a one-week period, and his most recent seizure on May 21, 2020, was the "most severe to date that [he] has experienced while in BOP custody." (Id. at 1-2.) Defendant also claims that he has been "too weak at times to even walk or sit up for long periods of time," and now relies on his bunkmates to help him move throughout the facility. (Id. at 2.) Defendant believes that his new medication, Valproic Acid, is not helping him and has in fact been making his seizures worse. (Id. at 3.) Yet, despite the BOP's recommendation that Defendant report his seizures and submit to an evaluation at a local hospital, Defendant refuses to receive treatment outside FCI Ft. Dix for fear of being quarantined in the same area as other symptomatic COVID-19 inmates upon his return. (Id.)

On June 9, 2020, the Government filed a Response in Opposition to Defendant's Motion for Release Pursuant to 18 U.S.C. § 3532(c)(1)(A)(i). (Doc. No. 302.) In it, the Government advances two arguments in opposition to Defendant's release to home confinement. First, the Government asserts that Defendant's medical needs do not constitute the extraordinary and compelling reasons that warrant Compassionate Release, especially given the BOP's extraordinary efforts to protect inmates from the COVID-19 virus. Second, the Government argues that even if Defendant's medical conditions were extraordinary and compelling, his release would be inappropriate in light of the relevant Section 3553(a) sentencing factors, given his criminal history and the length of time he has served his sentence.

The Government asserts that Defendant has not shown that his medical condition constitutes an extraordinary or compelling circumstance for several reasons. First, while it concedes that Defendant may suffer from epilepsy, hypertension, mild obesity, and mental health

issues, none of these medical conditions are identified by the Centers for Disease Control and Prevention ("CDC") as a risk factor for an adverse reaction to COVID-19.[4]  (Id. at 19-20.)  Second, the Government contends that Defendant "is trying to engineer his own release from prison by exacerbating his own medical problems."  (Id. at 21.)  Apparently, Defendant's BOP medical records illustrate his repeated failure to seek treatment or to take his prescribed medications.[5]  (Id. at 20.)  Third, the Government argues that Defendant's claims of medical distress are likely exaggerated and fictious in nature.  (Id. at 2.)  It notes that prior to his incarceration, Defendant was asked by the Government to provide his medical records to Pretrial Services to aid the Court's sentencing decision, yet Defendant failed to do so.[6]  (Id. at 3-4.)  The Government also points to filings submitted by Defendant before sentencing, including an affidavit from Dr. Jeffrey E. Summerton, Ph.D., that raises questions concerning the authenticity of Defendant's seizure disorder.[7]  (Id. at 4.)  Finally, the Government exhibits skepticism regarding the letter from Dr.

---

[4]  After the Government filed its Response, the CDC amended its guidance about medical conditions that increase a person's risk of suffering severe COVID-19 symptoms.  The most recent guidance includes obesity and hypertension as risk factors for COVID-19, albeit to different degrees.  See People of Any Age With Underlying Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION, (June 25, 2020), http://www.cdc.gov/coronavirus.

[5]  Defendant's medical records substantiate this allegation.  They show that Defendant has been uncooperative with BOP medical staff, has stopped taking his antipsychotic drugs altogether, and has refused to take blood tests or go to a hospital for his recent seizures.  (Doc. Nos. 302, 303.)

[6]  Defendant's Probation Officer was unable to obtain documentation to substantiate his medical ailments and ultimately concluded that Defendant's "physical condition does not appear to be an issue for sentencing[.]"  (Doc. No. 302 at 4.)

[7]  On August 20, 2019 Defendant filed a presentence memorandum, which included a psychological evaluation by Dr. Jeffrey E. Summerton, Ph. D., a psychologist licensed both in Pennsylvania and Delaware.  In a report, Dr. Summerton detailed findings following his evaluation on June 17, 2019.  Dr. Summerton diagnosed Defendant with Major Depressive Disorder, Generalized Anxiety Disorder, and Alcohol Use Disorder.  (Doc. No. 292 Ex. A at 28.)  He also noted Defendant's "extraordinary rate of alcohol consumption," and mentioned that several of Defendant's treatment providers have speculated that his various seizures that

Brittni Jones, which Defendant submitted along with his Motion for Release. (See Doc. No. 300 Ex. D.) It points out several spelling errors, including the Doctor's own misspelling of her name,[8] and characterizes the letter as generalized, nonscientific, and outdated, since Defendant has not been seen by Dr. Jones since 2018. (Id. at 20.)

The Government also notes that the BOP has taken significant measures to mitigate the risk of COVID-19 in federal prison. (Id. at 9.) It stresses that the BOP prepared for a coronavirus outbreak as early as January 2020, and on March 13, 2020 began implementing a multi-phase Coronavirus Action Plan. (Id. at 10.) On May 18, 2020, the BOP began Phase Five of the Action Plan, which has been followed at FCI Ft. Dix. (Id.) The Plan requires (1) all inmates to be quarantined inside their cells, (2) severe limitation of inmate movement inside the facilities and access to communal spaces, (3) cancellation of staff travel and trainings, (4) strong encouragement of all staff and inmates to wear face masks provided by the BOP, (5) screening of all faculty and new inmates for COVID-19 symptoms, and (6) suspension of all volunteer, social, and legal visits as well as contractors performing non-essential services. (Id. at 10-12.) FCI Ft. Dix has additionally introduced its own cleaning protocols at the facility and regular screening of all inmates for COVID-19 symptoms. (Id. at 14.) Furthermore, the Government points out that there have been no COVID-19 related deaths at FCI Ft. Dix and that all inmates with positive test results are housed in a separate complex at Ft. Dix, away from Defendant. (Id. at 13-14.)

---

resulted in hospitalization were "more likely due to alcohol withdrawal than the epilepsy he reported he has." (Id. at 23.) Furthermore, Dr. Summerton questioned whether Defendant suffered from "Factitious Disorder," which he described as, "the falsification of medical or psychological signs and symptoms...Methods of illness falsification can include exaggeration, fabrication, simulation, and induction." (Id. at 29.)

[8] Dr. Jones does in fact misspell her name in the Letter. At the top, she spells her name, "Dr. Brittni Jones," and later on in her signature, she spells her name "Dr. Brittany Jones." (Doc. No. 300 at 59.)

Next, the Government argues that even if Defendant's medical conditions presented compelling circumstances, the weight of the Section 3553(a) sentencing factors do not support his release.  (Id. at 21.)  The Government contends that the BOP can adequately manage Defendant's medical treatment as long as he takes his prescribed medication.  (Id.)  Additionally, it notes that releasing Defendant after he served less than 2 years of a 22-year sentence would fail to reflect the seriousness of his crimes or promote due respect of the law.  (Id.)  Moreover, since Defendant committed a second fraud scheme while on pretrial release, the Government asserts that there can be no assurance that Defendant will refrain from criminal activity in the future.  (Id.)

In addition to its Motion, the Government provided Defendant's BOP medical records to support its contention that Defendant has "sabotage[d]" the efforts of BOP health staff to properly treat him and has exacerbated his health conditions by not taking his medications.  (Doc. No. 302 at 5) (See also Doc. No. 303.)  On September 4, 2019, Defendant underwent a health screening, where he reported experiencing seizures more than once a week.  (Doc. No. 303 at 48.)  He was prescribed levETIRAcetam (Keppra) tablets for his epilepsy and Lisinopril for his hypertension. (Id.)  A few days later, on September 16, 2019, Defendant reported having a seizure after "missing a few doses" of his Keppra medication.  (Id. at 35.)  On September 23, 2019, Defendant was placed on suicide watch after reporting auditory hallucinations and suicidal thoughts.  (Id. at 30.)  The psychiatric report noted his "three prior suicide attempts via overdose with prescribed medications," and confirmed his diagnosis of Schizoaffective Disorder. (Id. at 30.)

The BOP medical records also show that on September 24, 2019, Defendant refused to have a blood test administered.  (Id. at 93.)  Then, on October 15, 2020, BOP Health Services reported:

> Inmate admits having become noncompliant with his medications. Admits even ceasing use of his antihypertensive medication.  Nonetheless noted no exacerbation

9

> of his derogatory auditory hallucinations.  Warned of high likelihood of relapse and
> physical illness with noncompliance with his medication regimen.

(Id. at 23.)  A few days after this incident, on October 24, 2019, an Administrative note was filed

describing Defendant's "continued noncompliance with pill line administration of his medication"

despite having previously discussed the risks of not taking his psychiatric medication with Health

Services staff.  (Id. at 22.)  At this point Defendant's treatment was discontinued due to his

disinterest in keeping up with the treatment.  (Id.)

On January 23, 2020, Defendant made a 'Sick Call' to BOP Health Services and reported

having a seizure the night before and another three days prior, which caused him to "almost fall

down the stairs."  (Id. at 16.)  As a result, his Keppra medication was increased from 2000mg to

3000mg.  (Id.)  On March 18, 2020, Defendant was seen for a preventative health visit where he

reported no pain or seizures. (Id. at 12-13.)  The doctor also reported that his "vital signs were

stable."  (Id.)  A month later, on April 18, 2020, Defendant picked up 90 tablets of Keppra from

the pill-line.  (Id. at 11.)  During his next encounter on May 4, 2020, Defendant reported to medical

staff that his medication was no longer preventing his seizures.  (Id. at 8.)  At Defendant's request,

BOP Health Services prescribed him Lamictal 100 mg q AM to be taken in addition to his Keppra

medication.  (Id.)  A few days later, on May 8, 2020, Defendant reported to health staff that his

Keppra and Lamictal medications were not working and that he had experienced sixteen seizures

in the past three weeks.  (Id. at 5.)  However, when asked why he did not report these seizures,

Defendant stated that "someone always helped him so an emergency was never called[.]"  (Id.)

The doctor also noted that Defendant was not compliant in taking his medication and was currently

taking no medication for his Schizoaffective disorder.  (Id.)  Finally, on May 12, 2020, Defendant

was seen for a follow-up visit where he stated his desire to "remain without [his] antipsychotic

medication at this time[.]" (Id. at 2.)  No additional seizures were reported during this encounter. (Id.)

On June 15, 2020 Defendant filed a Reply to the Government's Response to Petitioner's Motion for Reduction of Sentence and Compassionate Release.[9]  (Doc. No. 306.)  In the Reply, Defendant responds to the Governments allegations that his seizure disorder has been manufactured due to the COVID-19 virus and that his current medical crisis is due to self-sabotage. (Id. at 3,4,8.)  He states that his seizures have continued to worsen because he has not had proper access to his Keppra medication and, as of June 10, 2020, he has experienced thirty-seven grand-mal seizures.  (Id. at 4.)  Defendant also submitted an affidavit from his bunkmate, Sampson Lee, who claims to have witnessed these episodes and has "picked [Defendant] off the floor numerous times during and after seizures."  (Id. at 19, Ex. B.)  Additionally, Defendant asserts that while the BOP medical records describe him as "missing some does of his anti-seizure medication," these instances were in fact due to him running out of his medication and not being able to obtain more from the Medical Unit.  (Id. at 8-9.)  Defendant admits that he refused to have his blood drawn on September 24, 2019; however, he states this was because the procedure required him to "reach his arm out of a metal hole," and he could not see what was on the other side.  (Id. at 9.)  During this encounter, Defendant was on suicide watch and could not put himself in such a "vulnerable" and "compromising situation."  (Id.)  Furthermore, Defendant admits that he stopped taking his anti-

---

[9]     In the Reply, Defendant notes that on May 29, 2020, he received a second Letter of Denial for Compassionate Release from the Warden of FCI Ft. Dix.  (Doc. No. 306 at 1.)  In the Letter, the Warden justified his denial on the grounds that Defendant's "current condition is stable, [he has] no terminal illness, and [his] medical conditions are not debilitating."  (Id. at 18, Ex. A.)  However, Defendant claims that he is "physically unable to stand up and walk to the phone or computers," and that he relies on his fellow inmates to move around.  (Id. at 2.)

psychotic medication because of severe side effects, and that he missed the administration of his anti-seizure medication because seizures left him too weak to walk to the pill-line.  (Id. at 10.)

Additionally, Defendant avers that he has other risk factors not previously disclosed.  (Id. at 5-8.)  Defendant asserts that his hyperlipidemia, or high cholesterol, presents an additional risk factor "not previously known or identified."  (Id. at 7.)  He submits research from the "Journal of Internal Medicine," claiming that patients who suffer from severe high cholesterol have a greater risk of experiencing cardiac complications from COVID-19.  (Id. at 8.)  He also argues that while he may not have pulmonary hypertension, his hypertension and heart disease present a risk factor for COVID-19 because the CDC includes "all types of heart and lung diseases" as a risk factor for experiencing serious illness from COVID-19.  (Id. at 5-6.)  Moreover, he contends that his epilepsy and hypertension alone could kill him, and "the additional danger posed by the COVID 19 [sic] virus to [his] life is immeasurable."  (Id.)

## III.   DISCUSSION

### A.  The Analytical Framework Regarding Motions for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)

Generally, a district court "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c).  There are, however, "a few narrow exceptions" to this general "rule of finality," Freeman v. United States, 564 U.S. 522, 526 (2011), including the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A).  As amended by the recently enacted First Step Act, it empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies.[10]  18 U.S.C. § 3582(c)(1)(A)(i).  The statute provides that a court

---

[10]   A defendant may file a motion for compassionate release directly with a district court after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

> may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).  Congress, however, has not defined the term "extraordinary and compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to constitute an extraordinary and compelling reason.  28 U.S.C. § 994(t).  Instead, Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission.  Section 1B1.13 of the Sentencing Guidelines explains that a sentence reduction under Section 3582(c)(1)(A) may be ordered where a court determines:

> [A]fter considering the factors set forth in 18 U.S.C. § 3553(a), that—
>
>> (1) (A) Extraordinary and compelling reasons warrant the reduction; . . .
>>
>> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>>
>> (3) the reduction is consistent with this policy statement.

---

warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  In other words, before a defendant can make such a request to the Court, he "must at least ask the Bureau of Prisons (BOP) to do so on [his] behalf and give [the] BOP thirty days to respond" Raia, 954 F.3d at 955, and if the BOP does respond adversely within the thirty days, to then exhaust any available administrative appeals during that period.  See 18 U.S.C. § 3582(c)(1)(A)).  Here, Defendant has met the exhaustion requirement because he sent his first request to the Warden of FCI Ft. Dix on March 23, 2020 and waited more than thirty days before filing the instant Motion on May 13, 2020.

Application Note 1 to Section 1B1.13 discusses the meaning of "extraordinary and compelling reasons," and lists three specific qualifying circumstances: (1) a defendant's medical condition, (2) age, or (3) family circumstances. U.S.S.G. § 1B1.13 app. note 1(A)–(C). This Note states:

> Provided the defendant [is not a danger to the safety of any other person or to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.
>
>> (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii)   The defendant is—
>>
>>> (I)    suffering from a serious physical or medical condition,
>>>
>>> (II)   suffering from a serious functional or cognitive impairment, or
>>>
>>> (III)  experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.
>
>> (i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

14

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 n.1(A)-(C). Application Note 1 further provides a "catch-all" provision, which allows a court to modify a sentence for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D).[11]

The Application Notes only provide "helpful guidance" and are "not ultimately conclusive[.]" United States v. Rodriguez, No. 03-271, 2020 U.S. Dist. LEXIS 58718, at *17 (E.D. Pa. Apr. 1, 2020) (quoting United States v. Fox, No. 14-03, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019). Since the Sentencing Commission has not yet amended Section 1B1.13 or its commentary to account for the First Step Act, a district court has the authority to independently assess whether there are extraordinary and compelling reasons warranting a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). See Rodriguez, 2020 U.S. Dist. LEXIS 58718 at *17.

In general, however, "[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." United States v. Somerville, No. 12-225, 2020 U.S. Dist. LEXIS 93935, at *18 (W.D. Pa May 29, 2020) (internal quotation omitted). In the Third Circuit, this means that "the mere existence of COVID-19 in

---

[11] Although by its express language Section 1B1.13 applies to motions brought by the Director of the BOP, the current consensus is that the First Step Act removed this requirement. See generally, United States v. Rodriguez, No. 03-271, 2020 U.S. Dist. LEXIS 58718, at *17 (E.D. Pa. Apr. 1, 2020) (considering whether a defendant bringing a direct-to-court motion for compassionate release demonstrated "extraordinary and compelling reasons" and using Section 1B1.13 as "helpful guidance.").

society and the possibility that it may spread to a particular prison alone cannot independently justify … release." United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).  In addition, "[m]ost, though not all, of the cases where compassionate release has been granted also involved some showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner is incarcerated." Somerville, 2020 U.S. Dist. LEXIS 93935, at *18.  Thus, "a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held." Id. at *20.

If a district court determines that an extraordinary and compelling reason exists, it must then weigh that reason against the Section 3553(a) factors to determine if a sentence reduction is warranted and, if so, the extent of such reduction.  See id. at *2 (explaining that "the Court must weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a).").  Section 3553(a), however, establishes factors for a court to consider in initially imposing a sentence, so not every factor applies to motions for compassionate release.  In the instant context, the applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b. to afford adequate deterrence to criminal conduct;

    c. to protect the public from further crimes of the defendant; and

       d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

  . . .

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(2), (6)-(7).  If a balance of a defendant's extraordinary and compelling reason and the Section 3553(a) factors support a reduced sentence, the court may reduce the prison term, modify the terms of supervised release, or both.

**B.  Defendant's Motion for Compassionate Release Will Be Denied.**

Defendant's Motion will be denied because he has not shown extraordinary and compelling reasons for his release.  Further, even if Defendant's professed medical conditions and risk of contracting COVID-19 in prison constituted extraordinary and compelling reasons for release, the relevant Section 3553(a) factors counsel against a reduction or modification of his sentence.  Each of these conclusions is discussed in turn below.

**1.  Defendant's Medical Conditions Do Not Present Extraordinary and Compelling Reasons.**

Defendant has not shown the kind of particularized vulnerability to COVID-19 needed to constitute compelling reasons for release.  The Court is not convinced that Defendant has a sufficiently serious medical condition that places him at a uniquely high risk of illness or death if he were to be infected by COVID-19, nor is the Court convinced that Defendant has shown more than a non-speculative risk of contracting COVID-19 at FCI Ft. Dix.

First, Defendant's medical conditions are not severe enough to warrant release.  Defendant claims to suffer from epilepsy, non-pulmonary hypertension, hyperlipidemia, mild obesity, and

mental health issues. District courts, however, routinely deny motions for compassionate release based on these alleged medical conditions.  See United States v. Falci, No. 17-228, 2020 U.S. Dist. LEXIS 108498, at *12-14 (D.N.J. June 22, 2020) (denying a motion for compassionate release where the defendant suffered from hypertension because "[t]here is no indication that Defendant suffers from pulmonary hypertension or any other 'serious heart condition' that the CDC has identified as a high-risk factor."); United States v. Yanney, No. 4:15-CR-298, 2020 U.S. Dist. LEXIS 116480 at *10 (M.D. Pa. July, 2, 2020) (finding defendant's obesity and hypertension insufficient to qualify  as an extraordinary and compelling reason for compassionate release); United States v. Numann, No. 3:16-cr-00065, 2020 U.S. Dist. LEXIS 72285 at *8 (D. Alaska April 24, 2020) (denying defendant's motion for compassionate release because "[t]here is no evidence that epilepsy or hypothyroidism make a person more susceptible to COVID-19.").

Defendant further contends that his hyperlipidemia, or high cholesterol, presents a new risk factor "not previously known or identified," (Doc. No. 306 at 7).  However, district courts have similarly rejected motions for compassionate release based on this alleged risk factor, too.[12]  See

---

[12]   The Court has considered the CDC's guidance on conditions that increase an individual's risk of severe illness from COVID-19.  In its most recent guidance, dated June 25, 2020, the CDC outlines two categories of risk factors. The first category includes conditions that will increase an individual's risk of experiencing severe illness from COVID-19.  The second category is more tenuous. It includes conditions that may increase an individual's risk of severe illness. Of Defendant's alleged medical conditions, two are listed under these categories.  First, obesity, which the CDC defines as a body mass index ("BMI") of 30 or higher, is listed as a condition that will increase an individual's risk of severe illness from COVID-19.  Defendant presents a BMI of 31.  Second, non-pulmonary hypertension is listed as a condition that may increase an individual's risk of severe illness from COVID-19. Defendant has non-pulmonary hypertension. He also has epilepsy, high cholesterol, and mental health disorders, but they do not qualify as risk factors.  See People of Any Age With Underlying Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION, (June 25, 2020), http://www.cdc.gov/coronavirus.  The CDC's guidance, however, is not binding on this Court and, in any event, there is no showing that either condition substantially diminishes Defendant's ability to provide self-care at FCI Ft. Dix.

United States v. Hanes, No. 4:09-CR-39, 2020 U.S. Dist. LEXIS 108348 at *8 (E.D. Tex. June 19, 2020) (denying motion for compassionate release because defendant's conditions of hyperlipemia and hypertension do not qualify as an extraordinary and compelling reason); United States v. Quintero, Nos. 5:11-cr-711, 5:11-cr-550, 2020 U.S. Dist. LEXIS 118229 at *8 (N.D. Cal. July 6, 2020) (denying defendant's motion for compassionate release and finding that defendant's hyperlipidemia, other medical conditions, and positive COVID-19 test results did not "individually or collectively, rise to the level of extraordinary and compelling reasons[.]").

The Court further finds the authenticity and severity of Defendant's seizure disorder questionable. Not only is the medical documentation of Defendant's epileptic condition prior to his incarceration lacking, but there is some speculation that Defendant's condition has been exaggerated, and even fabricated. (See Doc. No. 292, Ex. A at 28.) For example, Dr. Jeffrey E. Summerton, Defendant's former psychologist, noted that Defendant's prior health care providers opined that Defendant's seizures were more likely due to alcohol withdrawal than epilepsy. Dr. Summerton also suggested that Defendant may suffer from "Factitious Disorder."[13] (See id. at 23, 29.) Additionally, Defendant's medical records show that he has often failed to take his seizure medication while in custody, refused medical treatment such as hospitalization, and failed to report his recent streak of at least sixteen seizures to BOP medical staff. (Doc. No. 303.)

The Letter that Defendant submitted on behalf of Dr. Brittni Jones, M.D., is equally puzzling. (Doc. No. 300, Ex. D at 59.) There are several spelling and typographical errors, including a misspelling of Dr. Jones' signature. The Letter also vaguely states that "Mr. Wragg would be at a heightened risk of death secondary to his medical conditions" without describing

---

[13] As noted supra, Dr. Summerton described "Factitious Disorder" as, "the falsification of medical or psychological signs and symptoms." (Doc. No. 292 Ex. A at 29.)

how his mental health issues or severe epilepsy increase his risk of COVID-19 related complications.  (See id.)  Given the errors and its perfunctory analysis, the Letter is entitled to less weight.

Furthermore, none of Defendant's complaints meet any of the medical conditions listed in sub-section (A) of Application Note 1 to U.S.S.G. § 1B1.13 Sentencing Guidelines.[14]  Defendant is not suffering from any terminal illness, such as cancer, ALS, or advanced dementia, that would suggest an "end of life trajectory."  Defendant's conditions can be well-managed when treated properly and are not classified as "terminal."  Further, while the Court recognizes that Defendant's alleged seizure-disorder and mental health issues may equate to a "serious physical or medical condition," and "cognitive impairment" under Section 1B1.13, Defendant has not shown that they "substantially diminish" his ability to "provide self-care within the environment of a correctional facility and from which [he] is not expected to recover."  U.S.S.G. § 1B1.13 n.1(A)(ii).  Since Defendant has purposely stopped taking his medications and has failed to comply with BOP treatment recommendations, any inability to provide self-care is self-inflicted.[15]

Second, Defendant has not shown that he faces an immediate and certain risk of contracting COVID-19 at FCI Ft. Dix.  Rather, Defendant has only speculated that he could contract the virus while in federal custody.  As the Government notes, the BOP has taken extensive

---

[14]  In determining whether Defendant's medical conditions constitute an "extraordinary and compelling reason," the Court has considered a myriad of factors, including Application Note 1 to Section 1B1.13 of the Sentencing Guidelines.  But, as noted above, the Sentencing Guidelines are not binding and the Court has considered the appropriate factors to determine whether Defendant presents "extraordinary and compelling" reasons for release.

[15]  To the extent that subsection (D) of Application Note 1 provides a "catch-all" provision allowing a court to modify a sentence for all other "extraordinary and compelling reasons" not listed in subsections (A)-(C), Defendant still has not shown any reasons warranting relief.  In addition, subsections (B) and (C) are irrelevant in this case, as Defendant is well under the age of 65, and does not exhibit any of the family circumstances listed in subsection (C).

measures to protect inmates from the spread of the coronavirus, including the regular screening of inmates and staff.  (Doc. No. 302 at 11.)  While Defendant and his bunkmate state that there have been over seventy inmates infected with COVID-19 at FCI Ft. Dix (Doc. No 300 at 2), the only inmates who have tested positive are housed in a completely different section of the prison, far from where Defendant is currently located.  (Doc. No. 302 at 13.)  The Government reports that there have been no positive COVID-19 cases in Defendant's particular unit, and no reported deaths in the entire complex.  (Id. at 13-14.)  Therefore, Defendant has not shown more than a speculative risk that he will be exposed to the COVID-19 virus.

## 2. The Section 3553(a) Sentencing Factors Do Not Weigh in Favor of Defendant's Release.

Finally, the relevant Section 3553(a) factors do not support Defendant's release to home confinement.  First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics.  See 18 U.S.C. § 3553(a)(1).  Defendant was convicted of serious crimes, including wire fraud, securities fraud, and conspiracy, that resulted in the imposition of a 22-year sentence.  (Doc. Nos. 1, 300.)  Although Defendant's crimes were non-violent, his fraudulent endeavors resulted in the theft of over $54 million and devastated the lives of hundreds of victims.  (Id.)  Defendant also has shown a tendency to continue criminal activity, given that he committed an additional fraud while on pretrial release for the Mantria Ponzi scheme.

Second, the Court has considered whether Defendant's proposed release reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes by the Defendant.  See 18 U.S.C. § 3553(a)(2).  Defendant has served less than 2 years of a 22-year sentence for serious crimes.  Allowing Defendant to finish the majority of his sentence at home would in no way reflect the egregious nature of his crimes, promote respect for the law, or provide just punishment.

Additionally, given Defendant's history, there is no assurance that Defendant would be deterred from engaging in yet another fraud while on release.

To the extent that Defendant's sentence must provide him with necessary "educational or vocational training, medical care, or other correctional treatment," 18 U.S.C. § 3553(a)(2)(D), the Court views this as a neutral factor. Defendant was already educated with a college degree before his incarceration. In terms of Defendant's medical care, the Court acknowledges that he suffers from mental health issues and needs treatment for his mental health conditions and various physical ailments. Defendant, however, has not shown that the BOP cannot adequately manage his medical needs because he has not been compliant with BOP health staff's medical advice and recommended treatment. The Court would be more equipped to evaluate the sufficiency of the BOP's medical care if Defendant was cooperative and compliant with the BOP health staff's medical advice, including taking his prescribed medications and undergoing the recommended blood testing and, when needed, hospitalization. However, since this is not the case, there is no showing that Defendant is not being provided adequate medical care at FCI Ft. Dix.

Third, the Court considered the "need to avoid unwarranted sentence disparities among defendants with similar records." See 18 U.S.C. § 3553(a)(6). On April 8, 2019, the Court sentenced Defendant's co-defendant, Amanda Knorr, to 30 months incarceration for her participation in the Mantria Scheme. (Doc. No. 270.) Knorr received a significantly lesser sentence than Defendant because she was less culpable than Defendant and cooperated with the Government.[16] (Doc. No. 291 at 25.) Therefore, if the Court were to release Defendant now, he would effectively serve the same sentence as Knorr.

---

[16] Knorr worked with the Government throughout the entire investigation and testified at trial. (Doc. No. 291 at 25.) Additionally, Knorr's "post-offense conduct was stellar," and unlike

Further, other defendants convicted of similar Ponzi schemes have served sentences well in excess of two years. See e.g., United States v. Madoff, No. 09-213, 2009 U.S. Dist. LEXIS 132713 (S.D.N.Y., June 26, 2009) (Defendant involved in $65 billion Ponzi scheme sentenced to 150 years in prison); United States v. Stanford, No. 09-342, Dkt. No. 878 (S.D. Tex. June 14, 2012) (Defendant orchestrated $7.2 billion Ponzi scheme sentenced to 110 years in prison); United States v. Jones et al., No. 2:07-cr-01076, Dkt. No. 337 (C.D. Cal. April 3, 2009) (Defendant sentenced to 20 years in prison for involvement in $32 million Ponzi scheme.) Therefore, to modify Defendant's sentence would not serve the interest of ensuring consistent punishment for similar offenses.

Fourth, the need to provide restitution to the victims of the offenses is a neutral factor. Defendant owes $54,531,488.57 in restitution and has made no showing that he would be able to repay any portion of that amount if released compared to his ability to repay while incarcerated. As a result, this factor does not weigh for or against Defendant's release and, on balance, the Section 3553(a) factors do not support a modification or reduction in Defendant's sentence.

## IV. CONCLUSION

In sum, Defendant has not shown extraordinary and compelling reasons for his release because his medical conditions do not put him at a high risk of COVID-19 related illness or death, and his risk of contracting the virus while in prison is only speculative. Furthermore, the Section 3553(a) sentencing factors strongly weigh against his release, especially given the seriousness of Defendant's crimes and the length of his remaining sentence. Therefore, his Motion for Compassionate Release (Doc. No. 300) will be denied. An appropriate Order follows.

---

Defendant, she has not participated in any further fraud schemes since the Mantria scheme. (Id.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>TROY WRAGG,<br><br>               Defendant. | CRIMINAL ACTION<br>NO. 15-398 |

## **ORDER**

**AND NOW**, this 16th day of July 2020, upon consideration of Defendant's Letter (Doc. No. 298), which the Court construes as a <u>pro se</u> motion for compassionate release; Defendant's Motion for Compassionate Release (Doc. No. 300); Defendant's Supplemental Brief in Support of his Motion (Doc. No. 301); the Government's Response in Opposition (Doc. Nos. 302, 303); Defendant's Reply (Doc. No. 306); and in accordance with the Opinion of the Court issued this day, it is **ORDERED** as follows:

1. Defendant's Letter Motion (Doc. No. 298) is **DENIED**.

2. Defendant's Motion for Compassionate Release (Doc. No. 300) is **DENIED**.


BY THE COURT:


<u>/s/ Joel H. Slomsky</u>
JOEL H. SLOMSKY, J.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION |
| TROY WRAGG, | NO. 15-398 |
| Defendant. | |

## <u>ORDER</u>

**AND NOW**, this 18th day of November 2020, upon consideration of Defendant's Emergency Motion for Compassionate Release (Doc. No. 323), the Government's Response to Defendant's Motion (Doc. No. 324), Defendant's Replies to the Government's Response (Doc. Nos. 325, 326), and the Government's letter Response (Doc. No. 328), it is **ORDERED** that Defendant's Motion (Doc. No. 323) is **DENIED**.[1]

---

[1] On July 16, 2020, the Court denied Defendant's initial Motion for Compassionate Release. (Doc. Nos. 307, 308). In a twenty-three page Opinion, the Court considered the provisions of 18 U.S.C. § 3582(c)(1)(A) and found Defendant's proffered "extraordinary and compelling reasons" were insufficient to grant his compassionate release. (Doc. No. 307 at 17-21.) The Court also held that the 18 U.S.C. § 3553(a) sentencing factors heavily weighed against Defendant's release. (<u>Id.</u> at 21-23.) Defendant subsequently appealed the Court's decision to the Third Circuit Court of Appeals, but he has withdrawn the appeal. (Doc. Nos. 310, 327.)

On November 2, 2020, Defendant filed his present Motion, titled "Defendant's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. 3582," and again asks the Court to grant him compassionate release pursuant to the First Step Act (18 U.S.C. § 3582(c)(1)(A)) in light of his COVID-19 diagnosis and the concomitant risk it poses given his medical history. (Doc. No. 323 at 3, 5-6.) Defendant also argues that his worsened medical condition, when considered with his recent COVID-19 diagnosis, warrant his release. (<u>Id.</u>) Additionally, he asks the Court to give more weight this time to his "potential two decades of strict home confinement; the severity of his medical conditions; his conduct in prison and extraordinary efforts at rehabilitation; and his viable release plan. . ." than to the 18 U.S.C. § 3553(a) sentencing factors the Court discussed when denying his first Motion. (Doc. No. 325 at 7.)

On November 6, 2020, the Government filed a Response in Opposition to Defendant's Motion. (Doc. No. 324.) In its Response, the Government stresses the Court's prior discussion of the

§ 3553(a) sentencing factors, provides cases where other courts have denied compassionate release based on a defendant's COVID-19 diagnosis, and avers that Defendant has a mild case of COVID-19. (Id. at 1-3.) Specifically, the Government notes that, aside from his COVID-19 diagnosis, there has not been a significant change in Defendant's medical condition; his "mild case" of COVID-19 is being carefully monitored; he presents with good vital signs and oxygen saturation rate; and he is being treated only with acetaminophen. (Id. at 3-4.) On November 9, 2020, Defendant filed a Reply to the Government's response, providing a further description of his medical condition. (Doc. No. 325.) On November 12, 2020, Defendant filed a second Reply with additional evidence of his condition. (Doc. No. 326.) On November 18, 2020, the Government filed a Response letter to Defendant's two Replies. (Doc. No. 328.)

"The First Step Act empowers criminal defendants to request compassionate release for 'extraordinary and compelling reasons.'" United States v. Raia, 954 F.3d 594, 595 (3d Cir. 2020); 18 U.S.C. § 3582(c)(1)(A)(i). However, before a defendant can make such a request to the Court, he "must at least ask the [BOP] to do so on [his] behalf and give [the] BOP thirty days to respond" Raia, 954 F.3d at 595, and if the BOP does respond adversely within the thirty days, to then exhaust any available administrative appeals during that period. See § 3582(c)(1)(A). If the defendant exhausts his administrative appeals, a court may "reduce the term of imprisonment. . . , after considering the factors set forth in § 3553(a) to the extent they are applicable, if it finds that. . . extraordinary and compelling reasons warrant such a reduction. . . ." § 3582(c)(1)(A). In short, if a district court determines that an extraordinary and compelling reason exists, it must then weigh that reason against the § 3553(a) factors to determine if a sentence reduction is warranted and, if so, the extent of such reduction. See United States v. Somerville, 463 F. Supp. 3d 585, 588 (W.D. Pa. 2020) (explaining that "the Court must weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a)."). If a balance of a defendant's extraordinary and compelling reason and the section 3553(a) factors support a reduced sentence, the court may reduce the prison term, modify the terms of supervised release, or both.

Here, Defendant has exhausted his administrative appeals, but his Motion will be denied for two reasons: first, he has failed to present an extraordinary and compelling reason for his compassionate release, and second, the applicable § 3553(a) factors do not warrant such release. This Court has previously found in the Opinion dated July 16, 2020 that Defendant's hypertension, epilepsy, obesity, mental health, and hyperlipidemia conditions do not establish extraordinary and compelling reasons for his release. (Doc. No. 307 at 17-20.) In his Emergency Motion, he does not present a significant change in any of these conditions since the filing of that Opinion. Although Defendant is now infected with COVID-19, the careful monitoring of his condition, his good vital signs and oxygen saturation rate, and his acetaminophen treatment all indicate that he is receiving adequate care while incarcerated. (Doc. No. 324 at 3-4; Doc. No. 328 at 2-3.) And as the Government noted in its November 18, 2020 letter Response, Defendant does not require daily medical assessment for his COVID-19 diagnosis. (Doc. No. 328 at 2-3.) Defendant's November 15, 2020 medical record shows he ambulates without assistance, is not in respiratory distress, has a normal electrocardiogram reading, and is advised to return if his condition worsens. (Id. at 3.) Neither Defendant's claims in his Replies that he now needs to use a wheelchair with assistance nor his additional

BY THE COURT:


/s/ Joel H. Slomsky_____
JOEL H. SLOMSKY, J.

---

complications from his seizures amount to extraordinary and compelling reasons for his release.  Therefore, Defendant's preexisting conditions, his present COVID-19 diagnosis, and other ailments do not amount to extraordinary and compelling reasons for his compassionate release.

Additionally, the § 3553(a) sentencing factors, as discussed in the Opinion dated July 16, 2020 denying his first compassionate release motion, continue to heavily weigh against Defendant's compassionate release. As discussed in the prior Opinion, the nature and circumstances of Defendant's offense and his history and characteristics, particularly his criminal recidivism, weigh against his release.  (Doc. No. 307 at 21.)  Defendant pled guilty to ten counts of wire fraud, securities fraud, and conspiracy; he subsequently pled guilty to an additional wire fraud offense that occurred during his pretrial release for his initial offenses.  (Id. at 2.)  These offenses involve a Ponzi scheme led by Defendant in which hundreds of victims were defrauded.  (Id.)  He owes $54,532,488.57 in restitution to his victims.  (Id.)

Furthermore, Defendant's release after serving only two years of his twenty-two-year sentence would not reflect the seriousness of his offenses, promote respect for the law, provide just punishment, afford adequate deterrence nor protect the public from further crimes by Defendant.  (Id. at 21-22.)  Defendant's sentence avoids unwarranted sentence disparities among defendants with similar records.  (Id. at 22-23.)  And his need to pay restitution does not weigh for or against his release.  (Id.)  Therefore, the § 3553(a) factors do not support a modification or reduction in Defendant's sentence.  For these reasons, Defendant's Motion will be denied.