IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

TROY WRAGG,

　　　　　　　　　Defendant.

CRIMINAL ACTION
NO. 15-398; NO. 18-465

## OPINION

**Slomsky, J.**                                        **September 4, 2024**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ........................................................................................................ 3

II.  **BACKGROUND** ......................................................................................................... 4

    **A.   Factual and Procedural Background** ........................................................................ 4

    **B.   Defendant's Appellate Waiver Provisions and Guilty Pleas** ...................................... 5

        1.   The March 2, 2017 Guilty Plea Agreement and Colloquy ........................................ 5

        2.   The December 7, 2018 Guilty Plea Agreement and Colloquy ................................. 11

    **C.   Evidentiary Hearing on Defendant's Motion to Vacate, Set Aside,
    or Correct Sentence** ............................................................................................. 18

        1.   Testimony of Joseph Mancano, Esquire ............................................................... 18

        2.   Testimony of Defendant ...................................................................................... 23

        3.   Testimony of Megan Hallet ................................................................................. 26

III. **STANDARDS ON AN APPELLATE WAIVER PROVISION
IN A PLEA AGREEMENT** ........................................................................................ 28

**IV. ANALYSIS** ......................................................................................................... 29

    **A.** **Disqualification under 28 U.S.C. § 455** ....................................... 29

    **B.** **The Appellate Waiver Provisions Were Entered into Knowingly and Voluntarily** ................................................................................. 34

    **C.** **Enforcement of the Appellate Waiver Provisions Will Not Result in a Miscarriage of Justice** ........................................................... 34

    **D.** **The Appellate Waiver Provision Will Be Enforced on Defendant's First Claim That His Conviction Was Time-Barred** ................................ 35

    **E.** **The Appellate Waiver Provision Will Be Enforced on Defendant's Second Claim That the Government Offered False Evidence About a Suicide Victim at His Sentencing and the Court Relied on That Evidence in Sentencing Him** ..... 37

    **F.** **The Appellate Waiver Provision Will Be Enforced on Defendant's Third Claim That He Was Over-Sentenced Compared to Similarly-Situated Defendants** ........ 40

    **G.** **Defendant's Ineffective Assistance of Counsel Claims Fail** ...................................... 42

        1.   Failure to Argue the Statute of Limitations Issue ................................... 43

        2.   Failure to Disclose Defendant's Medical History Involving Epilepsy ................. 43

        3.   Failure to Object to Government's Evidence of a Suicide Victim ......................... 46

        4.   Failure to File a Notice of Appeal ........................................................... 47

        5.   Failure to Object to the Loss Calculation in the Presentence Report ................... 52

**V.** **CONCLUSION** ..................................................................................... 52

## I.      INTRODUCTION

Defendant Troy Wragg is currently serving a twenty-two (22)-year sentence for wire fraud, securities fraud, and conspiracy.  Before the Court is his <u>pro se</u> Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, in which he alleges that (1) his conviction was time-barred under the applicable statute of limitations, (2) false testimony was proffered by the Government during his sentencing hearing and relied upon by the Court in imposing his sentence, (3) he received a disproportionately long sentence compared to other similarly-situated defendants, and (4) his counsel was constitutionally ineffective.[1]  (Doc. No. 366.[2])  The Government opposes the Motion on the grounds that Defendant's Motion is untimely, he waived his right to collaterally attack his sentence in his plea agreement, and his legal contentions are meritless.  (Doc. No. 378.) For reasons that follow, Defendant's Motion will be denied.

---

[1]  On September 1, 2022, while the instant § 2255 Motion was pending, Defendant filed another § 2255 Motion.  (Doc. No. 384.)  He filed the same Motion in his second case.  (Crim. No. 15-398, Doc. No. 62.)  28 U.S.C. § 2244 provides:

> Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

28 U.S.C. § 2244(b)(2).  Because Defendant has not received authorization from the United States Court of Appeals for the Third Circuit to file a successive § 2255 motion, his second § 2255 Motion (Doc. No. 384) will be dismissed.

On October 15, 2023, with approval from the Court, Defendant filed a Memorandum in Further Support of his first § 2255 Motion.  (Doc. No. 404.)  The Memorandum was incorrectly filed as a third § 2255 Motion.  The Court will consider it as a supplemental memorandum of law in support of Defendant's § 2255 Motion.  On October 19, 2023, the Government filed a Response to the Memorandum.  (Doc. No. 405.)

In his Motion, Defendant also requests that this Court disqualify or recuse itself under 28 U.S.C. § 455 from further consideration of this case.  However, for reasons discussed <u>infra</u>, Defendant's requests are without merit and this Court will not recuse itself.

[2]  Defendant filed the same Motion is his second case.  (<u>See</u> Crim. No. 15-398, Doc. No. 57.)

II.     **BACKGROUND**

A.  **Factual and Procedural Background**

In a July 17, 2020 Opinion denying Defendant's Motion for Compassionate Release, the

Court described the factual and procedural background of this case as follows:

On September 2, 2015, a grand jury returned an Indictment (Doc. No. 1) charging Defendant with the following offenses:

1)  Conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 (Count I);

2)  Wire fraud, in violation of 18 U.S.C. § 1343 (Counts II-VIII);

3)  Conspiracy to engage in securities fraud, in violation of 18 U.S.C. § 371 (Count IX); and

4)  Securities fraud, in violation of 15 U.S.C.§§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (Count X).

(Doc. No. 1.)

From March 1, 2005 to April 30, 2010, Defendant was the leader of the Mantria Ponzi scheme, reported, among other things, to be the "largest green energy fraud in United States history." (Doc. Nos. 1, 291.) Along with his two co-conspirators, Defendant stole over $54 million and devastated financially the lives of several hundred victims. (Doc. No. 291 at 1.) Defendant advertised Mantria Corporation as a real estate and "green energy products" business venture and promised to reward investors with returns as high as 484%. (Id. at 3.) In reality, Mantria essentially had no earnings or profits, and Defendant and his co-conspirators made "materially false statements and omitted material facts to mislead investors as to the true financial status" of the company. (Doc. No. 1 at 5, ¶¶ 10-11.) Defendant kept this scheme alive by paying early investors with funds received from new investors. (Id.) In 2009, the pyramid scheme collapsed, and Defendant's fraudulent activity was exposed. (Doc. No. 291 at 4.) As a result, many of the victims of the scheme lost their entire life savings, retirement funds, and even homes.[3] (Id. at 1.)

On March 2, 2017, Defendant appeared before the Court and pled guilty to all ten counts of wire fraud, securities fraud, and conspiracy. (Doc. No. 94.) On October 24, 2018, the Government filed an Information alleging Defendant's involvement in a second wire fraud scheme that occurred while he was on pretrial release for his initial offenses. (Doc. No. 232 at 1.) On [December 7, 2018], Defendant pled guilty

---

3     This case will be referred to as "the Mantria case."

to the additional count of wire fraud. (Doc. No. 300, Ex. A.) On August 20, 2019, the Court sentenced Defendant in both cases to 264 months imprisonment, five years of supervised release, and to pay $54,531,488.57 in restitution. (Id. at Ex. A, Ex. B.)

(Doc. No. 307 at 1-2.)

### B. Defendant's Appellate Waiver Provisions and Guilty Pleas

#### 1. The March 2, 2017 Guilty Plea Agreement and Colloquy

In the appellate waiver provision of his March 2, 2017 plea agreement, Defendant waived various rights to appeal his conviction and sentence.  (See Doc. No. 96 at 8.)  Specifically, the appellate waiver provision provided:

10.     In exchange for the promises made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

    a.     Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

    b.     If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal or petition for collateral relief but may raise only a claim, if otherwise permitted by law in such a proceeding:

        (1)     that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 4 above;

        (2)     challenging a decision by the sentencing judge to impose an "upward departure" pursuant to the Sentencing Guidelines;

        (3)     challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court; and

> (4)      that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance of counsel.

> If the defendant does appeal or seek collateral relief pursuant to this subparagraph, no issue may be presented by the defendant in such a proceeding other than those described in this subparagraph.

(Id. at 8-9.)

     At Defendant's guilty plea hearing on March 2, 2017, the Court had the following exchange with him concerning paragraph 10 of the Plea Agreement:

> THE COURT: . . . Then paragraph ten on page eight is a provision that we usually call the appellate waiver provision. It deals with your rights on appeal by entering into this guilty plea agreement.

> And it says in paragraph ten, "In exchange for the promises made by the Government in entering this plea agreement, you voluntarily and expressly waive all right to appeal or collaterally attack your conviction, sentence or any other matter relating to the prosecution, regardless of what provision of law would apply."

> Do you see that?

> DEFENDANT: Yes, Your Honor.

> . . .

> THE COURT: Paragraph B provides that, "If the Government doesn't appeal, then you can – you can still appeal, but – or petition for collateral relief – but you can only raise the claim, if otherwise permitted by law in such a proceeding," and there's four carve-outs:

> "You can raise on appeal" – this is if the Government doesn't appeal – "that the sentence on any count of conviction exceeds the statutory maximum for that count; number two you can challenge a decision by the Sentencing Judge to impose an upward departure pursuant to the Sentencing Guidelines; you can also challenge a decision by the Sentencing Judge who imposed an upward variance above the final Sentencing Guideline range that the Court determines; and number four is that you can raise on appeal that the attorney who represented you during the course of this criminal case provided constitutionally ineffective assistance of counsel."

So I want you to understand that if you appeal or seek collateral relief, and its states on page nine, "No issue may be presented by you in such a proceeding other than those described in this subparagraph."

Do you understand?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, I want you to understand that subject to these four very narrow exceptions, you're giving up your right to appeal both the validity of your guilty plea and the legality of your sentence.  Do you understand?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, paragraph ten provides how filing an appeal or collateral attack may constitute a breach of the plea agreement.  And you've gone over this paragraph carefully with your counsel?

DEFENDANT:  Yes, Your Honor.

. . .

(Doc. No. 130 at 21:7-23:7.)

During both guilty plea colloquies, Defendant also acknowledged that he thoroughly discussed the Plea Agreement with his lawyer, had enough time to discuss it with his lawyer, and was fully satisfied with his lawyer.

THE COURT:   Are you fully satisfied with Mr. Mancano's representation?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, I understand there's a plea agreement in this case.

. . .

THE COURT:   All right.   Did you voluntarily sign this plea agreement?

> DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  Did you read it before you signed it?
>
> DEFENDANT:  Yes.
>
> THE COURT:  Did you thoroughly discuss it with your attorney?
>
> DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  Have you had enough time to talk over with Mr. Mancano (Defendant's lawyer) the plea agreement?
>
> DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  If you need more time, I'll give it to you.  Do you need more time?
>
> DEFENDANT:  No – no, Your Honor.

(Id. at 8:10-13; see also Crim. No. 18-465, Doc. No. 37 at 6:24-7:13.)  Finally, the Court asked

defense counsel, among other things, the following:

> THE COURT:  Are counsel satisfied that Mr. Wragg is competent to enter a guilty plea?
>
> MR. MANCANO [Defense Counsel]:  Yes, Your Honor.
>
> MR. LIVERMORE [Government Counsel]:  Yes, Your Honor.
>
> THE COURT:  Are counsel satisfied that he has knowingly and voluntarily agreed to the appellate waiver found in paragraph ten[4] of the plea agreement?
>
> MR. MANCANO:  Yes, Your Honor.
>
> MR. LIVERMORE:  Yes, Your Honor.
>
> THE COURT:  And are counsel satisfied that he understands the terms of the plea agreement provision, waiving the right to appeal or collaterally attack his guilty plea or sentence?

---

[4]   During the December 7, 2018 guilty plea colloquy, during similar questioning of counsel for Defendant and the Government, the Court referred to paragraph 13 where the appellate waiver provision of his guilty plea agreement is found.  (See Crim. No. 18-465, Doc. No. 37 at 39.)

MR. MANCANO:  Yes, Your Honor.

MR. LIVERMORE:  Yes, Your Honor.

(Id. at 56:6-24.)[5]

In addition, the Court engaged in the following discussion regarding Defendant's mental health and competence to enter his guilty plea:

> THE COURT:  Have you had any drugs or alcohol within the last 72 hours?
>
> DEFENDANT:  No.
>
> THE COURT:  Is there anything we discussed about the drugs or alcohol or your mental health today that prevents you from understanding why we're in court today?
>
> DEFENDANT:  No.
>
> THE COURT:  All right.  Can you hear and understand me all right?
>
> DEFENDANT:  Yes.
>
> THE COURT:  All right.  Mr. Mancano, is there anything about Mr. Wragg in regard to the drugs or alcohol or his mental – his mental state that would prevent him from understanding why we're in court today?
>
> MR. MANCANO:  No, Your Honor.
>
> THE COURT:  All right.  You've had full discussions with him about the nature of these proceedings?
>
> MR. MANCANO:  Extensive, Your Honor.

(Id. at 7:7-25.)

The Court then made the following findings:

---

[5]   At the December 7, 2018 guilty plea hearing, the Court engaged in similar questioning, which is quoted in full below.  (Crim. No. 18-465, Doc. No. 37 at 39:5-8.)

>THE COURT:  All right.  I find that Mr. Wragg is fully alert, competent and capable of entering an informed guilty plea.  I find that the pleas are knowing and voluntary and not the result of force or threats or any promises apart from the plea agreement disclosed here in open court.
>
>I find that Mr. Wragg has knowingly and voluntarily agreed to the appellate waiver provision in paragraph ten of the plea agreement and that he understands the terms of the plea agreement provision waiving his right to appeal or collaterally attack his guilty plea or sentence.
>
>I find that the plea is supported by an independent basis in fact containing each of the essential elements of the offenses to which Mr. Wragg is pleading guilty, and I find that he understands the charges, his legal rights and the maximum possible penalty and that he understands that he is giving up his right to a trial.

(Id. at 57:12-58:2.)[6]

The Court then once again ensured that Defendant's choice to plead guilty was being made of his own free will.

>THE COURT:  Mr. Wragg, do you now wish to plead guilty?
>
>DEFENDANT:  Yes, Your Honor.
>
>THE COURT:  . . . [I]s your decision to plead guilty being made of your own free will?
>
>DEFENDANT:  Yes, Your Honor.

(Id. at 58:4-8; Crim. No. 18-465, Doc. No. 37 at 40:21-25.)

The Clerk of the Court then took Defendant's plea, and the Court accepted it.

---

[6]  At the December 7, 2018 colloquy, during the guilty plea in the second case, the Court made almost identical findings on (1) Defendant's alertness, competence, and capability of entering a plea, (2) Defendant's knowing and voluntary entry of the plea and the appellate waiver provision, (3) knowledge of the terms of the plea and the appellate waiver provision, (4) the underlying independent basis of fact containing each of the essential elements of the offense to which he is pleading guilty, and (5) Defendant's understanding of the charge, his legal rights, and maximum possible penalty.  (Crim. No. 18-465, Doc. No. 37 at 40:5-20.)

> THE COURT:  All right.  I'll ask the clerk to take the plea.
>
> COURTROOM DEPUTY:  Troy Wragg, you have previously pled
> not guilty to the charges against you contained in Criminal
> Indictment Number 2015-398-1, which charges you with conspiracy
> to commit wire fraud in Count 1 in violation of Title 18 of the United
> States Code, Section 371; and in Counts 2, 3, 4, 5, 6, 7 and 8 with
> wire fraud and aiding and abetting in violation of Title 18, Section
> 1343 and 18, Section 2; and in Count 9 with conspiracy to commit
> securities fraud in violation of Title 18 of the United States Code,
> Section 371; and in Count 10 with securities fraud in violation of
> Title 15, Section 78j(b), 78ff, and Title 17 of the Code of Federal
> Regulations, Section 240- -- 240.10b-5 and aiding and abetting in
> violation of Title 18, Section 2.
>
> Now, how do you plead to these charges against you, guilty or not
> guilty?
>
> DEFENDANT:  Guilty.
>
> . . .
>
> THE COURT:  All right.  Defendant's pleas of guilty are accepted.
> I find and adjudge you guilty of the offenses.

(Id. at 58:9-25, 60:5-7.)  At the December 7, 2018 plea hearing, the Court took Defendant's plea:

> THE COURT:   All right.  Let me take the plea, Mr. Wragg in
> Criminal No. 18-465 in Count 1 charging you with wire fraud.  You
> have previously pled not guilty.  How say you now to the charge in
> Count 1?  Guilty or not guilty?
>
> DEFENDANT:  Guilty.
>
> THE COURT:  All right, your plea of guilty is accepted.  I find and
> adjudge you're guilty of the offense.

(Crim. No. 18-465, Doc. No. 37 at 41:1-7.)

## 2.  The December 7, 2018 Guilty Plea Agreement and Colloquy

Although there are similarities in the two guilty plea agreements and plea colloquies,

because they are critical to the issues raised in Defendant's § 2255 Motion, they are quoted from

separately.

11

In the appellate waiver provision of Defendant's December 7, 2018 plea agreement, Defendant waived various rights to appeal his conviction and sentence.  Specifically, the appellate waiver provision provides:

13.    In exchange for the promises made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.  As part of this knowing and voluntary waiver of the right to appeal or collaterally attack the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statute to which the defendant is pleading guilty is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute.

    a.    Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

    b.    If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal or petition for collateral relief but may raise only a claim, if otherwise permitted by law in such a proceeding:

        (1)    that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 4 above;

        (2)    challenging a decision by the sentencing judge to impose an "upward departure" pursuant to the Sentencing Guidelines;

        (3)    challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court; and

        (4)    that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance of counsel.

    If the defendant does appeal or seek collateral relief pursuant to this subparagraph, no issue may be presented by the defendant in such a proceeding other than those described in this subparagraph.

(Crim. No. 18-465, Doc. No. 9 at 7-8.)

At Defendant's guilty plea hearing on December 7, 2018, the Court had the following

exchange with him concerning paragraph 13 of the December 7, 2018 plea agreement:

> THE COURT: Let's go to page 7, paragraph 13. This paragraph
> contains what we call an appellate waiver provision. It's -- it's rights
> you give up on appeal by entering into this plea agreement and
> certain rights that you have, but it says in paragraph 13, "In exchange
> for the promises made by the Government in entering this plea
> agreement, you voluntarily and expressly waive all rights to appeal
> or collaterally attack your conviction sentence or any other matter
> relating to your prosecution, regardless of what provision of law
> your rights would arise under." Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: As part of this knowing and voluntary waiver of the
> right to appeal or collateral attack the conviction and sentence, you
> expressly waive the right to raise on appeal or on collateral review
> any argument that, one, the statute to which you are pleading guilty
> is unconstitutional; and, two, the admitted conduct does not fall
> within the scope of the statute. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: Now, paragraph A provides that, if the Government
> appeals from this sentence, then you can still file a direct appeal of
> the sentence. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: And paragraph B provides that, if the Government
> does not appeal, then you can still file a direct appeal or petition for
> collateral review, but you are limited to these four things that are
> listed in what you can raise in the appeal or the petition for collateral
> relief. These are the four things. One, you -- you can argue that your
> sentence on any count or conviction exceeded the statutory
> maximum for that count. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: You can challenge a decision by the sentencing judge
> to impose an upward departure, pursuant to the Sentencing
> Guidelines. Do you understand?
>
> DEFENDANT: Yes, Your Honor.

> THE COURT: You can also challenge a decision by the sentencing judge to impose an upward variance above the final Sentencing Guideline range determined by the Court. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: And you can also raise on appeal that the attorney who represented you during the course of your criminal case provided ineffective assistance and counsel. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right. If you appeal or seek collateral relief, no issue may be presented in such a proceeding, other than those described in this subparagraph. Do you understand?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right, and I also want you to understand that, subject to these four very narrow exceptions, you're giving up the right to appeal both the validity of your guilty plea and the legality of your sentence. Do you understand?
>
> DEFENDANT: Yes, Your Honor.

(Crim. No. 18-465, Doc. No. 37 at 17:6-19:14.)

During this guilty plea colloquy, Defendant also acknowledged that he thoroughly discussed the plea agreement with his lawyer, had enough time to discuss it with his lawyer, and was fully satisfied with his lawyer:

> THE COURT: All right. And has your lawyer explained the nature and elements of the charge in the information?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: And fully explained your trial rights and defenses?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are you fully satisfied with Mr. Mancano and his representation?

DEFENDANT: Yes, Your Honor.

…

THE COURT: All right. We'll accept the waiver of indictment and proceeding by information, and we'll have the signed waiver of indictment also made a part of the record. Now, there's a plea agreement in this case. Do you have a copy of it in front of you?

DEFENDANT: Yes, Your Honor.

THE COURT: All right. I want to go over it with you. I'm not going to read everything that's in it, but I want to go over the important terms. The page 9 -- if you look at page 9, there, I see signatures. I -- is that your signature on page 9?

DEFENDANT: Yes, Your Honor.

THE COURT: And I see it's signed by Mr. Mancano. And dated 12/7/18; is that correct?

MR. MANCANO: That's correct, Your Honor.

THE COURT: All right, and I see the Government counsel also signed it. Did you voluntarily sign the plea agreement?

DEFENDANT: Yes, Your Honor.

THE COURT: And did you read it before you signed it?

DEFENDANT: Yes, Your Honor.

THE COURT: And did you discuss it thoroughly with your attorney?

DEFENDANT: Yes, Your Honor.

THE COURT: Did your lawyer fully explain what's in the plea agreement, what it means?

DEFENDANT: Yes, Your Honor.

THE COURT: Have you had enough time to talk over the plea agreement with your lawyer?

DEFENDANT: Yes, Your Honor.

(Id. at 7:4-13.)

Further, the Court asked counsel, among other things, the following:

THE COURT: Are Counsel satisfied that Mr. Wragg is competent to enter a guilty plea?

MR. MANCANO: Yes, Your Honor.

MR. LIVERMORE: Yes, Your Honor.

THE COURT: Are Counsel satisfied that his willingness to plead guilty is voluntary?

MR. MANCANO: Yes, Your Honor.

MR. LIVERMORE: Yes, Your Honor.

THE COURT: Are Counsel satisfied that Mr. Wragg has knowingly and voluntarily agreed to the appellate waiver provision found at paragraph 13 of the plea agreement and that he understands the terms of the plea agreement provision waiving the right to appeal or collaterally attack the guilty plea or sentence?

MR. MANCANO: Yes, Your Honor.

MR. LIVERMORE: Yes, Your Honor.

(Id. at 39:1-16.)

Finally, the Court engaged in the following discussion regarding Defendant's mental health and competence to enter his guilty plea:

THE COURT: Have you ever had or been treated for a drug or alcohol addiction?

DEFENDANT: Yes.

THE COURT: When was the last time?

DEFENDANT: 2016.

THE COURT: All right. And have you ever been treated for a mental illness?

16

DEFENDANT: Yes.

THE COURT: Last time?

DEFENDANT: This year.

THE COURT: This year?

DEFENDANT: Yes.

THE COURT: All right. And do--does the conditions for which you've been treated or the treatment prevent you, in any way, from understanding why you're in court today?

DEFENDANT: No, Your Honor.

THE COURT: All right. Have you had any drugs or alcohol within the last 72 hours?

DEFENDANT: No, Your Honor.

THE COURT: Are you feeling all right today?

DEFENDANT: Yes, Your Honor.

THE COURT: Can you understand and hear me all right?

DEFENDANT: Yes, Your Honor.

(Id. at 5:24-6:23.)

As excerpted above, there are significant similarities between Defendant's two guilty plea colloquies.  Specifically, during both colloquies, the Court asked whether Defendant "had any drugs or alcohol within the last 72 hours," to which he responded "[n]o." (Doc. No. 130 at 7:7-9; Crim. No. 18-465, Doc. No. 37 at 6:16-18.)  Additionally, the Court asked Defendant whether any mental health, drug, or alcohol treatments he received prevented him from understanding why he was in Court on those days.  (Doc. No. 130 at 7:10-12; Crim. No. 18-465, Doc. No. 37 at 5:24-6:14.)  He replied "[n]o." (Doc. No. 130 at 7:13; Crim. No. 18-465, Doc. No. 37 at 6:15.)  The

Court also asked him if he could understand and hear everything, to which Defendant replied "[y]es." (Doc. No. 130 at 7:14-15; Crim. No. 18-465, Doc. No. 37 at 6:21-23.)

Furthermore, on August 20, 2019, a sentencing hearing was held. Regarding both cases, the Court imposed a sentence of 22 years' imprisonment followed by a term of supervised release of five years, along with a $1,000 special assessment. (See Doc. No. 297.) In addition, Defendant was required to make restitution of $54,531,488.57 jointly and severally with his Co-Defendant Amanda Knorr. (See id. at 19.)

### C. Evidentiary Hearing on Defendant's Motion to Vacate, Set Aside, or Correct Sentence

On August 2, 2021, Defendant filed a pro se Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 366.) On July 25, 2023, the Court held an evidentiary hearing to address the issues raised in Defendant's Motion. (Doc. No. 400.) At the hearing, Defendant was represented by new counsel, Maureen Coggins, Esquire, who called three witnesses to testify: (1) Defendant's former attorney, Joseph Mancano, (2) Defendant's wife, Megan Hallet, and (3) Defendant.

### 1. Testimony of Joseph Mancano, Esquire

The first witness to testify was Joseph Mancano, Esquire, the attorney who represented Defendant during his two criminal cases. (Id. at 8-41.) Mancano described his professional experience, the conversations he had with Defendant, and his impressions of Defendant's physical and emotional state. He began by outlining his extensive experience handling criminal cases in federal court:

> MS. COGGINS: Attorney Mancano, how long have you been an attorney?
>
> MR. MANCANO: Since October of 1979.
>
> MS. COGGINS: And do you practice mostly criminal defense?

> MR. MANCANO:  I have been practicing criminal defense since 1987.
>
> MS. COGGINS:  Do you practice criminal defense in both the state and the federal [courts]?
>
> MR. MANCANO:  The vast majority of my work is in the federal courts. I do some state court work.
>
> MS. COGGINS:   And how long have you been handling federal criminal cases?
>
> MR. MANCANO:  Federal criminal cases, since 1987. I started as - - or actually since 1979. I was a federal prosecutor from 1979 to 1987 and then in 1987 I left the federal government went into private practice [and] started handling criminal defense cases.

(Id. at 9:7-9:20.)

Mancano testified that in 2015, shortly after Defendant was indicted, he was appointed as Defendant's attorney.  (Id. at 9:25-10:7.)  He recounted that he met with Defendant multiple times prior to his March 2, 2017 guilty plea in the first case.  (Id. at 11:21-12:6.)  Mancano testified that during their early discussions, Defendant did not "seem particularly interested in how the case would be defended" and he "made it clear that this was going to be a case for non-trial disposition." (Doc. No. 400 at 39:17-22.)  Nevertheless, Mancano "continued to go through the discovery" and "do [his] due diligence."  (Id. at 39:19-20.)

Mancano was questioned regarding discussions with Defendant on a possible statute of limitations defense and stated that Defendant never expressed concern regarding this defense.  (Id. at 16:17-20.)  In fact, he recounted, Defendant "never seemed to be that interested in potential defenses because from very early on he viewed this as a case that would result in some sort of non-trial disposition as opposed to a defensive trial."  (Id. at 16:21-17:1.)  Nevertheless, Mancano testified that he researched defenses including the applicable statute of limitations.  (Id. at 17:2-

19

10.)  After conducting research, Mancano's legal judgment was that there was no viable statute of

limitations defense available to Defendant:

> MS. COGGINS: In this case, what research, if any, did you do with
> regard to the statute of limitations on counts one through eight,
> which would have been the wire fraud counts?
>
> MR. MANCANO: Well, as I recall -- well, the general statute of
> limitations for wire fraud is five years, but this fraud involved a
> financial institution and when a financial institution is involved the
> statute of limitations is extended to ten. We had a financial
> institution here, it was Mantria Financial as I recall. So I would have
> -- that's something I would have considered in -- as a customary
> matter in handling federal criminal cases I'll look at the statute of
> limitations unless it's a situation where the criminal conduct is in
> close proximity in time to when the indictment is brought.  You
> know, and then I know what the statute is. I know that the statute of
> limitations would not be an issue.

(Id. at 17:11-25.)

When asked about his knowledge of Defendant's physical conditions, Mancano testified

that he was aware Defendant claimed to suffer from epilepsy.  (Id. at 13:5-14.)  However, he

recalled conflicting information regarding Defendant's diagnosis and stated:

> MR. MANCANO:  … there was some question about whether or
> not [Defendant] suffered from epilepsy[;] there was conflicting
> information on that and enough for me to argue in good faith for
> purposes of his sentencing that that was a condition that he suffered
> from, but there was [a] question regarding whether or not he truly
> suffered from epilepsy because his epilepsy diagnosis was based on
> self-reports.

(Id. at 13:8-14.)  Therefore, using his best judgment, Mancano did not introduce evidence of

Defendant's epilepsy at his sentencing.

Mancano was also questioned regarding the Government's introduction of allegedly false

information about a suicide victim at Defendant's sentencing.  At Defendant's sentencing, while

the Court was reviewing and discussing Defendant's Presentence Report, the following exchange

took place:

THE COURT: Obviously, these victims are such persons who will not get over the fraud committed on them. Their many, many years if not then, and I did read, I think, that one person actually committed suicide who was a victim.

MR. LIVERMORE: Judge, he certainly had some preexisting mental issues.

THE COURT: He did have mental issues.

MR. LIVERMORE: Before the Mantria situation.

THE COURT: Okay.

MR. LIVERMORE: And as I mentioned in the sentencing memo, Judge, it certainly that's not something reasonably [foreseeable] to Mr. Wragg, but the victims in this case were devastated. As you saw in the courtroom, during the McKelvy trial when one of the victims stood up and started cursing Mr. McKelvy in the middle of the Court -- in the middle of the trial, I mean, it's that type of emotional loss that many of the victims felt in this particular case, Your Honor.

THE COURT: All right. We'll consider then the reference in your presentence report to the suicide, but certainly the other victims were affected by to a very tremendous extent by the fraud committed upon them. How many victims were there in total?

MR. LIVERMORE: Judge, there were hundreds. It's difficult to give an exact number, because many of the victims invested through entities, so I wouldn't want to double count people, but there was at least 300. I've seen numbers as close 500, but that may be one person investing through multiple entities.

(Doc. No. 354 at 38:16-39:20.)  At the time, Mancano did not object to the statements of the Court and Government counsel about the suicide victim.

When asked why he did not object to the reference of a suicide victim at sentencing, Mancano explained that he did not object because his understanding was the Court would not consider that evidence.  He opined: "the implication to me from what Judge Slomsky said is that he was not considering [the statement regarding the suicide victim], he was focusing on the other victims."  (Doc. No. 400 at 29:22-24.)

Next, Mancano testified regarding the events that took place after Defendant's sentencing. He stated that Defendant "was extremely disappointed" with the sentence imposed by the Court. (Id. at 33:19-20.)  Regarding whether Defendant requested that he file an appeal, the following occurred:

> MS. COGGINS: When did you next speak with Mr. Wragg, after the sentencing?
>
> MR. MANCANO:  I can't tell you, Counsel. I mean, it -- I don't recall.
>
> MS. COGGINS:  Did you meet with him after?
>
> MR. MANCANO:  Of course, I did.
>
> …
>
> MS. COGGINS:  Would that have been within 14 days of the sentencing? Or of the [judgment] being entered?
>
> MR. MANCANO:  Probably, yes. Uh-huh.
>
> MS. COGGINS:  Do you recall Mr. Wragg telling you to file an appeal?
>
> MR. MANCANO:  I don't. I don't recall that.
>
> MS. COGGINS:  Did you ask Mr. Wragg if he wished to file an appeal?
>
> MR. MANCANO:  I did not because there were two appellate waivers which were in writing and which were confirmed under oath on the record.
>
> MS. COGGINS:  So with that in mind, what is it that you discussed with Mr. Wragg in these several conversations that you had with him after the sentencing?
>
> MR. MANCANO:  You know, I don't -- I don't remember exactly, but I know we had some conversations afterwards. I just don't remember what we talked about.
>
> MS. COGGINS:  Well, typically would you agree with me that conversations that you have with a client after the sentencing

revolve either around post sentence motions, rule 29 or an appeal; correct?

MR. MANCANO:  Well, I don't think anything's typical. I think it depends on the circumstances of the case so I wouldn't agree with you that it's typical. Those are certainly topics that do come up in certain cases, but this was a case where there were clear appellate waivers. I had no question in my mind that he understood them, and, you know, he had waived his appellate rights under these under these plea agreements.

(Id. at 34:13-35:19.)

At the end of his testimony, during cross-examination, Mancano described his perception of Defendant's mental state:

MR. LIVERMORE:  Can you please describe for your -- describe for the court how you would characterize Mr. Wragg's mental state, intelligence, things of that nature?

MR. MANCANO:  Every time I spoke with Mr. Wragg I found him to be lucid, clearheaded, he's a very smart guy. I think he went to Fox School of Business at Temple and graduated pretty highly in his class. He was -- I found him able to understand all of the concepts that I explained to him. I never had a meeting or a conversation with him where I felt that he did not fully understand what I was telling him.

MR. LIVERMORE:  And what about during Mr. Wragg's court appearances, was there any difference in his mental state on those days?

MR. MANCANO:  No, no. There wasn't any difference and the court interrogated him on his mental state, as I recall whenever we appear in court.

(Id. at 38:3-17.)

## 2.  Testimony of Defendant

The second witness to testify was Defendant.  He testified that prior to his sentencing, he met with Mancano several times.  During their early discussions, Defendant testified that he "was adamant about wanting to defend [his] case."  (Id. at 49:4-6.)  He also stated that "one of the very

23

first things" he mentioned to Mancano was a statute of limitations defense, but he did not recall

any discussions relating to research on that issue.  (Id. at 50:8-51:8.)

Defendant also testified regarding his mental and physical condition between the date of

his indictment and his first guilty plea:

> MS. COGGINS: Now, what was your physical condition between
> the indictment and the date of March 2nd, 2017?
>
> DEFENDANT: In every way shape or form I was a wreck. I was
> numerous cases of being in and out of the hospital that are all well
> documented in my file. I had just lost my mother tragically who
> literally died in my arms. My father was murdered 10 months before
> that. My uncle had committed suicide, you know, nine months
> before that. It was all a series of back-to-back to back things. So that
> was before my arrest, which happened less than a month after my
> mom passed away. So I was definitely in a very traumatic head space
> without any question.
>
> MS. COGGINS: What was your state of mind on March 2nd of 2017
> when you signed the guilty plea colloquy waiving your appeal
> rights?
>
> DEFENDANT: I was definitely under the influence without
> question.
>
> MS. COGGINS: Of what?
>
> DEFENDANT: Alcohol and pain medication.

(Id. at 52:5-20.)

Defendant was also questioned about his discussions with Mancano following his

sentencing.  He stated that "immediately after the [sentencing] hearing," he requested that

Mancano file an appeal.  (Id. at 44:3-6.)  He testified to the following regarding his conversations

with Moncano after his sentencing:

> DEFENDANT: I told [Moncano] that I was indeed very shocked at
> the sentencing and that I never believed that I would get that amount
> of time, that I believed that it was unfair and unjust and that we
> needed to file an appeal because there was -- I specifically remember
> this because I said it in a very what at the time was a very truthful

and that you might call it dramatic, where I said based on my medical conditions, which he seems to still have questions. I said that I would not make it in person at that moment that I would die before that sentence was up. And I told him there's no way that I -- I am proving that I need to do anything that I can to fight this case.

MS. COGGINS: And what was Mr. -- I'm sorry, Attorney Mancano's response?

DEFENDANT: He told me verbatim that if I filed an appeal that it would upset the judge and that he would likely give me more time.

MS. COGGINS: And your response?

DEFENDANT: I told him this is a point to Mr. Mancano's statement that he just made where he said that I had filed an appeal -- two appeal waivers, but yet Your Honor, Judge Slomsky, had told me directly while I was -- after sentencing he told me that I have 14 days to appeal Judge Slomsky said that that is in the sentencing transcript. So if I waived my appeal rights, how is the judge going to tell me that I did not have the ability to appeal? I stated this to Mr. Mancano. I stated to him the judge just said that I have 14 days to appeal that we need to appeal. And he said I do not think that it's a good idea I'm not going to do it.

MS. COGGINS: Did you meet with Mr. Mancano after that?

DEFENDANT: No.

MS. COGGINS: Is that the last that you heard from Mr. Mancano, either by letter, phone call, email or in person?

DEFENDANT: I have sent him a couple emails after that. I do not recall getting any responses from him.

MS. COGGINS: What were the emails that you sent to Mr. – Attorney Mancano?

DEFENDANT: They would have been about appealing.

MS. COGGINS: Did you also instruct anyone else to contact Mr. Mancano requesting an appeal?

DEFENDANT: Several times I had my wife reach out to Mr. Mancano.

MS. COGGINS: Was that within 14 days of the entry of the judgment of your sentence?

25

DEFENDANT: It was -- we did one within the first few hours afterwards when we realized that he was being adamant on not filing the appeal. We both knew, I set a letter through Core Links, an email through Core Links, I'm sorry. And my wife sent him a formal letter within sorry 72 hours after sentencing and then again three days later and we got no responses from either one of those three pieces of correspondence. My emails to him from Core Links and her two emails to him as well, we got no response back from him on those.

MS. COGGINS: And why did you not file a pro se appeal?

DEFENDANT: Well, at the time we were only given 14 days. There's two-fold reasons. I had no -- at the time I had no -- I'm a beginner in in the legal system I had no idea what was going on. I've never filed a pro se motion on my own and I was still under the belief that if you instruct an attorney to file an appeal for you that they are going to file an appeal for you. 14 days is not a lot of time as anybody can attest to and especially that considering the shock trauma that I was in after receiving the sentence. I honestly believed that Mr. Mancano was going to eventually do the right thing, and by the time that I realized he was not it was too late to file anything. And when I had the chance afterwards after I got stationary at a new prison I did start working on the case once I was able to meet with some people who informed me of my rights.

(Id. at 44:25-47:17)

### 3.  Testimony of Megan Hallet

The third and final witness to testify was Megan Hallet, Defendant's wife.  She testified regarding her experience with Defendant's physical and mental health.  In particular, she stated that she saw him suffer from seizures and that he struggled with depression.  (Id. at 73:7-75:14.) She also recounted that suicide was "an extremely fragile and sensitive topic for [Defendant]." (Id. at 77:1-2.)  Regarding Defendant's sentencing, she testified that after Defendant's sentence was announced she told Mancano: "[Defendant's sentence] is clearly absurd and unacceptable we have to appeal this" and that Mancano advised not to.[7]  (Id. at 78:21-22.)  She stated that at that

---

[7]   During Mancano's testimony, he was asked about this conversation:

point "under the advice of our legal counsel at the time," she trusted Mancano's experience and advice. (Id. at 79:14-23.)

      At the end of the hearing, the Court granted Defendant leave to file a supplemental memorandum in support of his Motion, which he filed on October 15, 2023. As noted earlier, Defendant improperly filed his supplemental memorandum as another Motion to Vacate, Set Aside, or Correct Sentence. The Court therefore will treat his Motion as supplemental briefing on his § 2255 Motion. On October 19, 2023, the Government filed a Response. Defendant's Motion is now ripe for disposition.

---

MS. COGGINS: Did you have a conversation immediately after [Defendant's sentencing] with Ms. Hallett? Ms. Megan Hallett?

MR. MANCANO: Immediately after that?

MS. COGGINS: Yes.

MR. MANCANO: I don't recall.

MS. COGGINS: In the hallway?

MR. MANCANO: Perhaps.

MS. COGGINS: Do you recall Ms. Hallett telling you that she was shocked and requesting that you file an appeal?

MR. MANCANO: She may have said she was shocked. As far as an appeal, we had two plea agreements which contained appellant waivers and he had under oath waived his appellate rights twice, so he had no right to appeal. If she had asked I would have said that.

MS. COGGINS: So my question is, did she request that you file an appeal?

MR. MANCANO: I don't recall.

(Doc. No. 400 at 33:21-34:12.)

### III.      STANDARDS ON AN APPELLATE WAIVER PROVISION
###           IN A PLEA AGREEMENT

"Criminal defendants may waive both constitutional and statutory rights," including the

right to appeal, "provided they do so voluntarily and with knowledge of the nature and

consequences of the waiver." United States v. Mabry, 536 F.3d 231, 236 (3d Cir. 2008). As noted

by the Third Circuit:

> Whereas a defendant bears the burden of presenting an argument that would render
> his waiver unknowing or involuntary, a court has an affirmative duty both to
> examine the knowing and voluntary nature of the waiver and to assure itself that its
> enforcement works no miscarriage of justice, based on the record evidence before
> it.

Id. at 237-38 (citing United States v. Khattak, 273 F.3d 557, 563 (3d Cir. 2001)). When reviewing

the enforcement of an appellate/collateral waiver, the Court must scrutinize the guilty plea

colloquy and ensure that the Court "'inform[ed] the defendant of, and determine[d] that the

defendant underst[ood] . . . the terms of any plea-agreement provision waiving the right to appeal

or to collaterally attack the sentence' as Federal Rule of Criminal Procedure 11(b)(1)(N) requires."

Id. at 239 (alterations in original) (quoting Fed. R. Crim. P. 11(b)(1)(N)).

Furthermore, in determining whether a miscarriage of justice would occur if the waiver

were enforced, there is not "a list of specific circumstances which would give rise to, or constitute,

a miscarriage of justice." Id. at 243. Instead, a court must employ a "common sense approach,"

considering factors such as:

> [T]he clarity of the error, its gravity, its character (e.g., whether it concerns a fact
> issue, a sentencing guideline, or a statutory maximum), the impact of the error on
> the defendant, the impact of correcting the error on the government, and the extent
> to which the defendant acquiesced in the result.

Id. at 242-32 (quoting United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001)). Declining to

enforce an appellate waiver due to a miscarriage of justice will be done sparingly, in narrow

circumstances.  United States v. Wilson, 429 F.3d 455, 458 (3d Cir. 2005) (quoting Teeter, 257 F.3d at 26)).

**IV.    ANALYSIS**

**A.  Disqualification under 28 U.S.C. § 455**

Before addressing the merits of Defendant's § 2255 Motion, this Court first will address his motion for an "Order for the recusal or disqualification of District Judge JOEL H. SLOMSKY." (Doc. No. 366 at 15.)  Defendant asserts that this Court should recuse or disqualify itself from matters relating to this case.  (See id. at 15-17.)  Defendant's request revolves around his belief that the Court improperly considered certain statements made by the Government regarding a victim of the Mantria Financial scheme who allegedly committed suicide.  (See id. at 15-16.)  His request also refers to the disposition of a compassionate release motion he filed in March 2021. Defendant alleges, in relevant part, that:

> Within a few days of filing [that compassionate release] motion . . . Judge Slomsky issued a "docket entry order" indicating that he denied the Petitioner's second compassionate release motion, and further stated that no matter what the Third Circuit decided, he would ignore their instructions on remand and issue the same decision.  Petitioner takes this as a clear statement that Judge Slomsky would not consider the merits of any future argument, the merits of his appeal if the Third Circuit agrees and remands it, and would ignore them because he has already pre-determined his decision or will not be persuaded otherwise.

(Id. at 16.)

Defendant's recusal or disqualification request arises under 28 U.S.C. § 455, which provides, in relevant part:

> (a)  Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b)  He shall also disqualify himself in the following circumstances:

(1)  Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
. . .
(5)  He or his spouse . . . :
. . .
(iv)  Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(a)-(b).

In addition, and relevant to the recusal request, is Federal Rule of Criminal Procedure 37, which expressly allowed this Court to make an indicative ruling on his third Motion for Compassionate Release which was filed pending the appeal of the denial of his second Compassionate Release Motion.  Rule 37 provides, in pertinent part, that:

If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

(1) defer considering the motion;

(2) deny the motion; or

(3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Crim. P. 37(a).

Regarding Defendant's first argument concerning the suicide victim referred to in the Government's sentencing memorandum, the Court did state on the record that it would consider this fact at sentencing which was subject to the limitations stated by Government counsel as follows:

THE COURT:  By August of 2017, Paragraph 94 [of Petitioner's pre-sentence report], [the mother of Buckley's girlfriend] wrote out a check for another $20,000.  Money was given to Mr. Wragg after it was cashed.  Wragg explained that he and Buckley were broke and needed the money.  I mean, this is a situation where someone just is engaged in inexorable conduct that takes advantage of innocent victims.  Obviously, these victims are such persons who will not get

over the fraud committed on them.  Their many, many years if not then, and I did read, I think, that one person actually committed suicide who was a victim.

MR. LIVERMORE:  Judge, he certainly had some preexisting mental issues.

THE COURT:  He did have mental issues.

MR. LIVERMORE:  Before the Mantria situation.

THE COURT:  Okay.

MR. LIVERMORE:  And as I mentioned in the sentencing memo, Judge, it certainly that's not something reasonably [foreseeable] to Mr. Wragg, but the victims in this case were devastated.  As you saw in the courtroom, during the McKelvy trial when one of the victims stood up and started cursing Mr. McKelvy in the middle of the Court - in the middle of the trial, I mean, it's that type of emotional loss that many of the victims felt in this particular case, Your Honor.

THE COURT: All right. We"ll consider then the reference in your presentence report to the suicide, but certainly the other victims were affected by to a very tremendous extent by the fraud committed upon them. How many victims were there in total?

MR. LIVERMORE: Judge, there were hundreds. It's difficult to give an exact number, because many of the victims invested through entities, so I wouldn't want to double count people, but there was at least 300. I've seen numbers as close 500, but that may be one person investing through multiple entities.

(Doc. No. 354 at 38:16-39:20.)

Although the Court did state it will consider then the prosecutor's reference in the Presentence Report to the suicide victim, this reference was a small portion of what the Court considered at sentencing.  Further, the prosecutor gave context that the suicide victim had been suffering with a mental health issue before the Mantria situation.  In all, there were hundreds of victims in this multimillion-dollar fraud, and there is no limitation on the amount of evidence the Court may consider at sentencing.  18 U.S.C. § 3661 provides that "[n]o limitation shall be placed

on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." See 18 U.S.C. § 3661. Given this latitude, "[d]istrict courts may consider a broad range of information when sentencing a defendant." United States v. Collare, No. 22-1551, 2023 WL 2524451, at *3 (3d Cir. Mar. 15, 2023). Therefore, regarding the reference to the suicide victim, when compared to the harm done to the 300 plus victims of Defendant's fraudulent scheme, the Court's impartiality at sentencing cannot be reasonably questioned. Simply put, the reference to the suicide victim is not a ground for recusal.

Regarding the compassionate release motions, after Defendant's second Motion for Compassionate Release was denied, Defendant appealed to the Third Circuit Court of Appeals. (Doc. No. 339.) Defendant then filed a third Motion for Compassionate Release while the appeal of the denial of his second Motion was still pending. (Doc. No. 350.) Accordingly, in an Order dated March 10, 2021 (Doc. No. 351) denying the third Motion for Compassionate Release, this Court stated that it "lack[ed] jurisdiction to resolve the instant Motion."[8] (Id. at 1.) However, the Court went on to note:

> Despite this jurisdictional impediment, the Court also will address the Motion on the merits and will provide an indicative ruling under Federal Rule of Criminal Procedure 37(a). For the reasons stated below, Defendant's Motion would be denied if the Third Circuit were to remand the case to this Court for consideration.

---

[8] The Third Circuit considered and explicitly approved similar actions by district courts in accordance with Federal Rule of Criminal Procedure 37(a). Notably, in United States v. Pawlowski, the Third Circuit noted that, notwithstanding the pendency of an appeal of a defendant's conviction and sentence, a district court may retain jurisdiction "to decide [a] compassionate release motion" but is "confined to denying it, indicating that it presents a substantial issue, or indicating that it would be granted if we were to remand the case to the District Court for that purpose." 967 F.3d 327, 329 n.3 (3d Cir. 2020).

(Id.)  This indicative ruling on the merits was made "[b]ecause of the implied urgency of Defendant's Motion."  (Id.)  Indeed, on November 17, 2021, the Third Circuit affirmed this Court's two Orders denying both of Defendant's Compassionate Release Motions.  (See Doc. No. 381 at 1.)  Because this Court denied the third Motion for Compassionate Release in accordance with Third Circuit precedent and Rule 37(a), Defendant's claims that such actions are evidence of bias that merit recusal or disqualification under § 455 are without merit.  Moreover, the Court never stated that it would not follow Third Circuit instructions.  Again, in this case, the Court's impartiality cannot be reasonably questioned, there was no prejudice to Defendant, and the Court's consideration of the reference to the suicide victim is not a ground for recusal.[9]  And, according to the Guide to Judiciary Policy, Volume 2 (Ethics and Judicial Conduct), Pt. B (Ethics Advisory Opinions):  "Conduct that arises in a judicial context does not serve as a proper basis to show bias or partiality within the meaning of Canon 3C(1)(a).", referring to a Canon in the Code of Conduct for United States Judges  (§ 3.0-2).

---

[9]  Defendant's other recusal arguments will be denied because they are conclusory statements. (See, e.g. Doc. No. 366 at 17 (". . . Judge Slomsky appears to have bias or prejudice or has made statements that question his impartiality and willingness to provide fair adjudication of the merits and facts of the case concerning Petitioner Wragg. . . . Judge Slomsky has personal knowledge of disputed evidentiary facts concerning the proceeding, and is a participant in events that may require his being called as a witness in the Petitioner's above-captioned 2255 action.").)  The Court was never called as a witness and its prior knowledge of the case is not grounds for recusal.  See United States v. Cammarata, No. 21-CR-00427-01, 2024 WL 246027, at *3 (E.D. Pa. Jan. 22, 2024)  ("[A] claim of bias or prejudice based on judicial knowledge gained from prior hearings or other cases is not sufficient grounds for disqualification of a judge whether it be from prior judicial exposure to the defendant or prior judicial rulings adverse to the defendant in the same or different cases."  (internal citation omitted)).

**B.  The Appellate Waiver Provisions Were Entered into Knowingly
      and Voluntarily**

The guilty plea agreements in Defendant's two cases and the March 2, 2017 and December

7, 2018 guilty plea colloquies, all quoted in relevant part above, confirm that Defendant understood

the terms of the Plea Agreements, including the provisions expressly waiving his right to appeal

or collaterally attack under § 2255 his conviction or sentence.  The colloquies with Defendant, the

statements of his counsel, and this Court's findings at the end of each colloquy confirm that

Defendant knowingly and voluntarily agreed to the appellate waiver provisions at the time of his

guilty plea.  In addition, during the guilty plea colloquies, the Court ensured that Defendant was

competent, the guilty plea agreements had been thoroughly explained to him, Defendant had a full

opportunity to discuss the agreements with his lawyer, and he had enough time to make informed

and voluntary decisions.  For these reasons, the Court is satisfied that Defendant knowingly and

voluntarily waived, <u>inter</u> <u>alia</u>, his right to collaterally attack his conviction and sentence.

**C.  Enforcement of the Appellate Waiver Provisions Will Not
      Result in a Miscarriage of Justice**

Since the Court has found that Defendant knowingly and voluntarily agreed to the appellate

waiver provisions in the guilty plea agreements, it must now decide whether it should decline to

enforce the waivers to avoid a miscarriage of justice.  As noted above, this is only done in narrow

circumstances.[10]

---

[10]  What would constitute a miscarriage of justice is noted below, although the list is not definitive
and the examples that follow do not apply here. <u>See</u>, <u>e.g.</u>, <u>United States v. Schwartz</u>, 511 F.3d
403, 405 (3d Cir. 2008) ("[W]e agree with Schwartz that his appellate waiver does not foreclose
his claim that the government breached the [Plea] Agreement . . . ."); <u>United States v. Shedrick</u>,
493 F.3d 292, 298 (3d Cir. 2007) ("Enforcing a collateral-attack waiver where constitutionally
deficient lawyering prevented Shedrick from understanding his plea or from filing a direct
appeal as permitted by his plea agreement would result in a miscarriage of justice."); <u>United
States v. Wilson</u>, 429 F.3d 455, 458 (3d Cir. 2005) ("[I]t would constitute a miscarriage of justice
to enforce a guilty plea made pursuant to a plea agreement if the defendant should have been
permitted to withdraw.").

In his § 2255 Motion, Defendant raised the following claims he contends show a miscarriage of justice: (1) his conviction in the Mantria case was time-barred; (2) the Government presented, and the Court relied upon in imposing his sentence, false evidence; (3) he was over-sentenced compared to other similarly-situated defendants; and (4) his counsel was constitutionally ineffective.  (Doc. No. 366.)  For reasons that follow, enforcing the appellate waiver provisions will not lead to a miscarriage of justice.

### D.   The Appellate Waiver Provision Will Be Enforced on Defendant's First Claim That His Conviction Was Time-Barred

In his § 2255 Motion, Defendant argues that he was indicted ten (10) months after the statute of limitations had expired on the crimes to which he pled guilty in the Mantria case.  (See id.)  Specifically, he contends that the applicable limitations period for his wire fraud charges (Counts I to VIII) is five years rather than ten (10) years because Mantria Financial is not a "financial institution" as defined by 18 U.S.C. § 20.  (See id.)  Defendant's argument regarding Mantria Financial, however, was expressly rejected by the Third Circuit in his co-defendant's appeal.  In United States v. McKelvy, the Third Circuit held that:

> Mantria Financial is a "financial institution," specifically a "mortgage lending business," [18 U.S.C.] § 20(1), because it "finance[d] . . . debt secured by an interest in real estate," id. § 27.  A financial institution need not be "the object of fraud" for § 3292(2) to apply, United States v. Pelullo, 964 F.2d 193, 216 (3d Cir. 1992), so it is immaterial that Mantria Financial "played an active part in the scheme," United States v. Serpico, 320 F.3d 691, 695 (7th Cir. 2003); see also United States v. Heinz, 790 F.3d 365, 367 (2d Cir. 2015).  The fraud affected Mantria Financial because the scheme required it to issue unprofitable loans to simulate demand, and it was ultimately liquidated as a result of the SEC enforcement action against the Ponzi scheme.  See United States v. Mullins, 613 F.3d 1273, 1279 (10th Cir. 2010) (Gorsuch, J.) (explaining a fraud affects a financial institution when it "exposed [the] institution to a new or increased risk of loss").
>
> The fraud affected other financial institutions as well.  At McKelvy's trial, two victims testified that they struggled to repay the "insured depository institution[s]," 18 U.S.C. § 20(1), that had loaned these victims the funds they invested in

Mantria's valueless securities.  Thus, the Ponzi scheme affected those lenders by increasing the risk that McKelvy's victims would default.

Because the fraud affected multiple financial institutions, the wire-fraud counts were subject to a ten-year statute of limitations, <u>see</u> 18 U.S.C. § 3293(2), and McKelvy's contention that the five-year statute of limitations rendered them untimely is incorrect.

No. 21-2547, 2022 WL 17091119, at *2 (3d Cir. Nov. 21, 2022) (emphasis in original).

The Third Circuit's holding that Mantria Financial is a financial institution and McKelvy's wire fraud offenses were subject to a ten-year statute of limitations applies equally to Defendant. Defendant was a co-conspirator and a co-defendant of McKelvy and the ten (10)-year statute of limitations would apply to him.  Defendant was indicted in this case within the ten-year period.

In addition, as noted above, subject to the limited exceptions contained in his guilty plea agreement, Defendant voluntarily and expressly waived all rights to appeal his conviction, sentence, or any other matter relating to his prosecution.  (<u>See</u> Doc. No. 93 at 8-9.)  This claim does not fall under any of the narrow exceptions described above except for the ineffective assistance of counsel claim, which is discussed <u>infra</u> in Section IV(G).  Once again, they are: (1) Defendant's sentence exceeds the statutory maximum, (2) challenging the imposition of an "upward departure" pursuant to the Sentencing Guidelines, (3) challenging the imposition of an "upward variance" pursuant to the Sentencing Guidelines, or (4) constitutionally ineffective assistance of counsel.  (<u>See</u> Crim. No. 18-465, Doc. No. 9 at 8.)  Therefore, for these reasons, Defendant's argument that his indictment in the above-captioned case was time-barred is without merit and no miscarriage of justice occurred.

**E.  The Appellate Waiver Provision Will Be Enforced on Defendant's Second Claim That the Government Offered False Evidence About a Suicide Victim at His Sentencing and the Court Relied on That Evidence in Sentencing Him**

Defendant's second argument contains two separate claims.  First, he avers that the Government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny when, after it presented evidence during the sentencing hearing about a victim of the Mantria scheme committing suicide, it failed to disclose, upon Defendant's request, the "details and [the] identity" of the victim.[11]  (Doc. No. 366 at 5.)  Second, Defendant asserts that the Court "heavily

---

[11] Defendant submits that "this entire narrative about a suicide victim amongst the Mantria investors is a complete fabrication.  He does not exist."  (Doc. No. 366 at 25.)  Defendant also contends that Assistant United States Attorney Livermore "delayed in addressing" questions by

Federal Public Defender Julie McGrain about the alleged suicide victim.  (Id.)

In an email exchange between Defendant and Ms. McGrain, McGrain informed Defendant that she had contacted Assistant United States Attorney Robert Livermore, who prosecuted his case, about the suicide victim and his response was:  "Unfortunately, I have been unable to unearth any more details.  It was something that was told to us while meeting with witnesses to prepare for the McKelvy trial."  (Id. at 46.)

In response to Defendant's argument regarding the allegedly false suicide victim, the Government stated that:

> During preparations for the trial of co-defendant [McKelvy], the government endeavored to meet with as many victims as possible.  Many of the victims were financially and emotionally devastated by Mantria's collapse.  Moreover, many of the victims felt remorse because they had recommended to their friends and family that they invest in Mantria only to see them equally devastated by the collapse.  The victims recounted to the investigators the friendships lost, the marriages ended, the familial relations strained as a result of the Mantria fraud.  More than one victim remembered a victim who committed suicide shortly after the collapse.
> . . .
> There was nothing prohibiting the government from sharing what the victims had reported.  As the defendant's own attorney advised him, "there is no indication in your sentencing transcript . . . that the district court relied in any way on this information in imposing your sentence."  See [(Doc. No. 366 at 46)].  The district court imposed sentence based upon WRAGG's intentional and deliberate conduct

 

 

 

in cheating hundreds of investors out of $54 million.  The post-offense actions of one victim were not material to the Court's sentence.

(Doc. No. 378 at 9-10.)

Although the prosecutor wrote that "there is no indication in your sentencing transcript . . . that the district court relied in any way on this information in imposing your sentence," as noted <u>supra</u>, the transcript does show some consideration by the Court of the reference to a suicide victim at sentencing.  The sentence imposed was not based solely on this reference.  Moreover, the Government did not commit a <u>Brady</u> violation in the way it was described.

relied" on this testimony, resulting in the imposition of a higher sentence.[12] (Id.) These arguments, however, do not fall within the limited exceptions in the appellate waiver provision.[13] (See Pg. 36

---

[12] Specifically, Defendant contends that "Judge Slomsky stated that '. . . and a person died because of this scam, they committed suicide, Yes?' (Doc. No. 366 at 38.) He further asserts that "the court placed the blame squarely on Mr. Wragg as a direct result of his convicted offenses and Mr. Wragg's sentence is predicated in no small part upon this now debunked claim." (Id. at 38.) However, these claims are incorrect and as noted previously, the Court's reference to the suicide victim was follows:

THE COURT:  By August of 2017, Paragraph 94 [of Petitioner's pre-sentence report], [the mother of Buckley's girlfriend] wrote out a check for another $20,000. Money was given to Mr. Wragg after it was cashed.  Wragg explained that he and Buckley were broke and needed the money.  I mean, this is a situation where someone just is engaged in inexorable conduct that takes advantage of innocent victims.  Obviously, these victims are such persons who will not get over the fraud committed on them.  Their many, many years if not then, and I did read, I think, that one person actually committed suicide who was a victim.

MR. LIVERMORE:  Judge, he certainly had some preexisting mental issues.

THE COURT:  He did have mental issues.

MR. LIVERMORE:  Before the Mantria situation.

THE COURT:  Okay.

MR. LIVERMORE:  And as I mentioned in the sentencing memo, Judge, it certainly that's not something reasonably [foreseeable] to Mr. Wragg, but the victims in this case were devastated.  As you saw in the courtroom, during the McKelvy trial when one of the victims stood up and started cursing Mr. McKelvy in the middle of the Court - in the middle of the trial, I mean, it's that type of emotional loss that many of the victims felt in this particular case, Your Honor.

THE COURT:  All right.  We'll consider then the reference in your presentence report to the suicide, but certainly the other victims were affected by to a very tremendous extent by the fraud committed upon them.  How many victims were there in total?

MR. LIVERMORE:  Judge, there were hundreds.  It's difficult to give an exact number, because many of the victims invested through entities, so I wouldn't want to double count people, but there was at least 300.  I've seen numbers as close [as] 500, but that may be one person investing through multiple entities.

supra.)  For this reason, Defendant's argument about the suicide victim also is waived.  Moreover, there has been no showing of any miscarriage of justice.  At sentencing, the Court, among other things, relied much more heavily on the number of victims and their losses and the effect of Defendant's conduct on them in sentencing Defendant.  The suicide was not "heavily relied" on.  As such, given the size of the Ponzi scheme and the number of victims, and for all the other reasons stated on the record at sentencing by the Court, the sentence imposed was warranted.

### F.  The Appellate Waiver Provision Will Be Enforced on Defendant's Third Claim That He Was Over-Sentenced Compared to Similarly-Situated Defendants

Next, Defendant argues that he was over-sentenced under the Sentencing Guidelines compared to similarly-situated defendants found guilty of orchestrating and committing Ponzi schemes.  (See id. at 40-41.)  However, this argument fails for two reasons.

First, Defendant stipulated that the amount of loss he was responsible for was "approximately $54 million."  (Doc. No. 96 at 7.)  Accordingly, the Court applied the 22-level sentence enhancement recommended by the Sentencing Guidelines for that amount of loss.  See U.S.S.G. § 2B1.1(b)(1)(L).[14]  As a result, Defendant's argument that he was over-sentenced based on an incorrect calculation of loss under the Sentencing Guidelines lacks merit.

---

(Doc. No. 354 at 38-40.)  As noted supra, the magnitude of the fraud, the number of victims, and the commission of another federal offense while on pretrial release all contributed to the sentence imposed on Defendant.

[13] Defendant alleges, however, that his defense counsel at sentencing was ineffective for failing to object to the reference to the suicide victim.  This argument is described infra in Section IV(G)(3).

[14] In addition, Defendant requests that this Court take judicial notice of SEC v. Mantria Corp., 2012 WL 3778286 (D. Colo. Aug. 30, 2012).  There, the court ordered disgorgement in the amount of $37,031,035.36 plus interest for "all contributions to Mantria not distributed by Mantria to its investors."  Id. at *3.  Defendant further relies on this Court's statements in United States v. McKelvy that "Defendants raised approximately $54.5 million from investors and paid

Second, and relatedly, the Court sentenced Defendant's co-conspirator and co-defendant Wayde McKelvy to eighteen (18) years imprisonment.  McKelvy filed a Notice of Appeal to the Third Circuit.  On appeal, McKelvy argued that his sentence was procedurally and substantively unreasonable.  However, the Third Circuit affirmed his sentence as reasonable.  Specifically, the court stated that:

> [T]he District Court did not err in failing to consider under 18 U.S.C. § 3553(a)(6) whether McKelvy's sentence would create unwarranted disparities with his codefendants because "a defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between codefendants' sentenced." United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006); United States v. Douglas, 885 F.3d 145, 153 n.6 (3d Cir. 2018) (same).
>
> The sentence imposed by the District Court was also substantively reasonable. McKelvy's argument to the contrary is that the sentence exceeded the Court's stated reason for incarceration, namely specific deterrence.  But he ignores the other reasons the Court articulated:  promoting respect for the law and deterring others from engaging in similar misconduct.  As we explained in Tomko, "[t]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." 562 F.3d at 568 (quoting United States v. Grier, 475 F.3d 556, 571 (3d Cir. 2007) (en banc)).  Here, the District Court properly emphasized the need to promote respect for the law and deterrence in light of the seriousness of McKelvy's

---

investors approximately $17.5 million in 'earnings,' resulting in a net loss of approximately $37 million." No. 15-398-3, 2020 WL 6044172, at *4 (E.D. Pa. Oct. 9, 2020), aff'd No. 21-2547, 2022 WL 17091119 (3d Cir. Nov. 21, 2022).  However, as this Court noted at co-defendant McKelvy's August 5, 2021 sentencing hearing:

> Defendant's second argument that the calculated loss of $54,531,488.57 should be reduced by the 17.5 million he repaid to investors is more [viable].  Because the 17.5 million was returned to investors before the scheme was detected, the calculation [of the] loss amount should be reduced by the 17.5 million.  This reduction, however, does not alter Defendant's based offense level because his new total loss and earnings is $37,031,488.57 which is still within the 2B1.1(b)(1)(L) loss amount range of 25 million and 65 million.  Therefore, the base offense level will be increased by 22 levels . . . .

(Doc. No. 376 at 39-40.)  Here, too, even accounting for the $17.5 million Defendant contends should have been subtracted from the $54 million, the total loss would have been $36.5 million. $36.5 million still falls within the 2B1.1(b)(1)(L) loss amount range of $25 million to $65 million.  Accordingly, Defendant's arguments about the calculation of loss at sentencing are without merit for this reason too.

offense—"a \$54 million Ponzi scheme that affect[ed] 300 victims" and "was
motivated by greed[.]" . . . Considering these circumstances, McKelvy has not
established that "no reasonable sentencing court would have imposed" his sentence.
Shah, 43 F.4th at 367 (quoting Tomko, 562 F.3d at 568).

United States v. McKelvy, 2022 WL 17091119, at \*3 (3d Cir. Nov. 21, 2022).

Here, Defendant was involved in the same scheme involving the same victims and the same

amount of money taken from defrauded victims. Additionally, in its July 16, 2020 Opinion, the

Court cited United States v. Jones, No. 07-1076, Doc. No. 337 (C.D. Cal. Apr. 3, 2009), where a

defendant was sentenced to 240 months' imprisonment and ordered to pay over \$28 million in

restitution for his role in a Ponzi scheme. Moreover, among other factors, given the magnitude of

the Ponzi scheme here, the number of victims, and the need to impose a sentence that reflects "the

egregious nature of his crimes, promote[s] respect for the law, or provide[s] just punishment,"

Defendant was sentenced appropriately. (Doc. No. 307 at 21.) Finally, Defendant is challenging

here the legality of his sentence. Under the appellate waiver provisions of his plea agreements, he

gave up his right to do so.

### G. Defendant's Ineffective Assistance of Counsel Claims Fail

Finally, Defendant argues that his counsel was constitutionally ineffective for five reasons:

(1) his counsel failed to argue the statute of limitations issue; (2) he failed to inform the Court that

Defendant was suffering from seizures and was taking prescription epilepsy medications around

the time when he negotiated his guilty pleas with the Government and when the Court conducted

its guilty plea colloquies with him; (3) he failed to challenge the Government's introduction of

allegedly false evidence of a suicide victim; (4) he failed to file a Notice of Appeal to challenge

his conviction and sentence; and (5) he failed to object to portions of the Presentence Report. (See

Doc. No. 366 at 8, 42-43.)

To state a claim for ineffective assistance of counsel, a petitioner must show that:

42

(1) [T]hat his counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced his client,' i.e., that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'

Bey v. Superintendent Greene SCI, 856 F.3d 230, 238 (3d Cir. 2017) (citations omitted).   A petitioner must satisfy both the first prong, called the "performance" prong, and the second prong, called the "prejudice" prong.  See Workman v. Superintendent Albion SCI, 915 F.3d 928, 938 (3d Cir. 2019).  Because Defendant's counsel's performance was neither below an objective standard of reasonableness under the "performance" prong, nor under any circumstances prejudicial, his ineffective assistance of counsel claim fails.

### 1.   Failure to Argue the Statute of Limitations Issue

First, Defendant argues counsel was ineffective for failing to argue that a five-year statute of limitations applied to his securities and wire fraud offenses since Mantria Financial is not a financial institution.  (See Doc. No. 366 at 4.)  However, the Third Circuit expressly rejected this argument and held that co-defendant McKelvy's wire fraud charges were governed by a ten-year statute of limitations because Mantria Financial is a financial institution.  See McKelvy, 2022 WL 17091119, at *2.  Since Defendant's offenses fall within the ten (10)-year statute of limitations too and he was indicted within that period, counsel's failure to challenge the five-year limitations period was not objectively unreasonable and did not prejudice Defendant.

### 2.   Failure to Disclose Defendant's Medical History Involving Epilepsy

Second, Defendant claims counsel was ineffective in not disclosing to the Court that while "executing the plea agreement and [during] the subsequent plea colloquy[,] . . . Petitioner was medicated with three powerful epilepsy prescription drugs after several weeks of suffering from severe, debilitating epileptic seizures."  (Doc. No. 366 at 42-43.)  In support of his claim, Defendant cites several cases he believes show that epilepsy renders his guilty plea involuntary

and not intelligent, though none of them do.  See Drope v. Missouri, 420 U.S. 162, 174-77 (1975) (holding that failure to order a competency exam after a defendant was hospitalized for attempting to commit suicide and, as a result, missed a portion of his capital trial violates due process of law); McMann v. Richardson, 397 U.S. 759, 771 (1970) (holding that "a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without more, entitled to a hearing on his petition for habeas corpus"); Dusky v. United States, 362 U.S. 402, 402 (1960) (holding that a defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and -- whether he has a rational as well as factual understanding of the proceedings against him") (internal quotation marks omitted); Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir. 2001)[15]; United States v. Gardner, 417 F.3d 541, 544 (6th Cir. 2005) (holding that a guilty plea is knowing, voluntary, and intelligent where a defendant "stated that he understood the nature of the offenses and acknowledged his guilt . . . [and] understood the consequences of his plea and the rights that he was waiving by pleading guilty"); United States v. Keller, 902 F.2d 1391, 1394 (9th Cir. 1990) (holding that a petitioner alleging ineffective

---

[15] The United States Court of Appeals for the Third Circuit addressed ineffective assistance of counsel for failing to inform the court of a defendant's incompetence in Jermyn v. Horn, 266 F.3d 257 (3d Cir. 2001).  There, the Third Circuit held that counsel was ineffective:

> if he or she failed to inquire into a defendant's competency and failed to request a competency hearing, despite indicia of incompetence that would provide reasonable counsel 'reason to doubt' the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense.

Id. at 300 (citation omitted).  Here, the Court's lengthy colloquies with Defendant confirm there was no indication that he was incompetent or otherwise incapable of communicating with counsel.  In fact, as the Court found on the record during both guilty plea colloquies, Defendant was "fully alert, competent and capable of entering an informed guilty plea.  I find that the pleas are knowing and voluntary. . . ."  (Doc. No. 130 at 57:12-14.)  The record is devoid of any facts supporting Defendant's assertions that his plea was anything but voluntary and knowing.

assistance of counsel regarding the decision to plead guilty "must allege that absent the erroneous advice, he would have insisted on going to trial").

Here, the Court's March 2, 2017 and December 7, 2018 plea colloquies confirm that Defendant was competent to enter a guilty plea and that nothing about drugs, alcohol, or his mental health inhibited his ability to understand his guilty plea.[16]   (See Doc. No. 130 at 7:10-25.) Moreover, as noted previously, his lawyer, Joseph Mancano testified at the evidentiary hearing that Defendant understood all of the proceedings in his case:

> MR. LIVERMORE:  Can you please describe for your -- describe for the court how you would characterize Mr. Wragg's mental state, intelligence, things of that nature?
>
> MR. MANCANO:  Every time I spoke with Mr. Wragg I found him to be lucid, clearheaded, he's a very smart guy. I think he went to Fox School of Business at Temple and graduated pretty highly in his class. He was -- I found him able to understand all of the concepts that I explained to him. I never had a meeting or a conversation with him where I felt that he did not fully understand what I was telling him.
>
> MR. LIVERMORE:   And what about during Mr. Wragg's court appearances, was there any difference in his mental state on those days?
>
> MR. MANCANO:  No, no. There wasn't any difference and the court interrogated him on his mental state, as I recall whenever we appear in court.

---

[16] Specifically, during both guilty plea colloquies, the Court asked whether Defendant "had any drugs or alcohol within the last 72 hours," to which Defendant responded "No."  (Doc. No. 130 at 7:7-9; Crim. No. 18-465, Doc. No. 37 at 6:16-18.)  Additionally, the Court asked Defendant whether any mental health, drug, or alcohol treatments he received prevented him from understanding why he was in Court on those days.  (Doc. No. 130 at 7:10-12; Crim. No. 18-465, Doc. No. 37 at 5:24-6:14.)  Defendant replied "No."  (Doc. No. 130 at 7:13; Crim. No. 18-465, Doc. No. 37 at 6:15.)  The Court also asked him if he could understand and hear everything, to which Defendant replied "Yes."  (Doc. No. 130 at 7:14-15; Crim. No. 18-465, Doc. No. 37 at 6:21-23.)

(Id. at 38:3-17.)   Therefore, neither Defendant's epilepsy nor the medications taken for his condition undermine the fact that Defendant's guilty pleas were knowingly, voluntarily, and intelligently entered.  Thus, defense counsel's performance did not fall outside the "wide range of reasonable professional assistance."   Strickland v. Washington, 466 U.S. 668, 689 (1984). Accordingly, Defendant's ineffective assistance of counsel claim regarding Defendant's medical history is without merit.

### 3.  Failure to Object to Government's Evidence of a Suicide Victim

Third, Defendant submits that counsel was ineffective because he failed to object to the Government's reference to suicide by one of the Mantria Financial scheme's victims.  (See Doc. No. 366 at 8, 42.)  However, this alleged failure was not prejudicial to Defendant because it did not change the outcome of his sentence given the extensive evidence of the harm caused by his involvement in the scheme to defraud.  During Defendant's sentencing hearing, the Court made many findings in accordance with the 18 U.S.C. § 3553(a) sentencing factors that warranted Defendant's sentence, including, inter alia:

> This case involved a major fraud and securities fraud committed against persons who were not sophisticated investors.  They were not persons who truly understood the nature of the investments that . . . the money was being invested in.  And they could not, because they were told major lies.  . . .

> This was a classic Ponzi scheme where money was taken from investors and money was repaid . . . to them from other investor funds and at some point during the economic crisis in 2009, 9 or 10, the scheme just collapsed.  As happens in many Ponzi fraud causes.  The number of victims here is astounding . . . .  But Mr. Wragg was very creative in coming up with schemes to convince people to turn over hard-earned money, money that was invested in their future and their family's future through very convincing lies and misrepresentations that he made to them, so that for those reasons and what's contained in the presentence report in terms of all the facts surrounding the offense.  These offenses committed here were quite serious and quite large.

> I've gone through his alcoholism, []his depression, his anxiety, but through it all he was able to educate himself, and build a business, Mantria itself, had over 50

employees at one point.  This was an extraordinary scheme carried out by someone who was an extraordinary fraudster.

The sentence has to reflect the seriousness of the offense, and it will and we've already gone over how serious these offenses were, and the impact they had on victims.  These victims will not forget how they were defrauded, and how they were lied to . . . .

[T]his is a major fraud that was committed over several years, and the people that were affected by this fraud will suffer many more years [than] you will serve in jail, that's for sure.

The nature of the fraud is sophisticated the way the scheme was carried out, the magnitude of the lies made to people, all compel that . . . in conjunction with all of the factors that I have to consider that a substantial period of incarceration will be imposed.

(Doc. No. 354 at 40-47.)  Further, Defendant committed an additional fraud while on pretrial release for the Mantria Ponzi scheme.  This fraud was the subject of the second case to which he pled guilty.  For all these reasons, Defendant's third argument that his counsel was constitutionally ineffective fails because counsel's performance in not objecting at sentencing to the reference to the suicide victim was not prejudicial.[17]

#### 4.   Failure to File a Notice of Appeal

Fourth, Defendant avers that his counsel "refused to file" a Notice of Appeal "and denied him a meaningful opportunity to challenge his conviction and sentence."  (Doc. No. 366 at 8, 43.)

In Valenta, the Third Circuit held that "[a] lawyer's performance is not objectively reasonable where the lawyer 'disregards specific instructions from the defendant to file a notice of appeal' because a defendant 'reasonably relies upon counsel to file the necessary notice.'"  2022 WL 265876, at **3-4 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (holding that

---

[17]   This finding is also buttressed by the fact that the prosecutor explained that the suicide victim also had mental health challenges unrelated to the Mantria fraud.  Simply put, the reference to the suicide victim did not in any remarkable way contribute to the sentence imposed.

47

disregarding specific instructions to file a notice of appeal is "professionally unreasonable")).  And unlike most ineffective assistance of counsel claims, a petitioner alleging that their counsel's failure to file a Notice of Appeal was prejudicial "need not show that the decision to undergo the process would have resulted in a more favorable outcome."  Velazquez v. Superintendent Fayette SCI, 937 F.3d 151, 163 (3d Cir. 2021).  Rather, a petitioner must show only that "but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed."  Flores-Ortega, 528 U.S. at 484.

Moreover, it is irrelevant for purposes of an ineffective assistance of counsel claim that a defendant signed an appellate waiver provision.  As the Supreme Court held in Garza v. Idaho, "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken," the petitioner has a claim for ineffective assistance of counsel "regardless of whether [he] has signed an appeal waiver."  139 S. Ct. at 747.  "Thus, the presence of the appellate waiver does not mean a defendant cannot be prejudiced by his attorney's failure to file an appeal on a ground not covered by the waiver."  Valenta, 2022 WL 265876, at *4 n.6.

Nevertheless, following the July 25, 2023 evidentiary hearing, Defendant has not shown that his counsel's performance was constitutionally deficient for not filing a Notice of Appeal.  As described above, Defendant's former attorney, Joseph Mancano, Esquire, testified at the evidentiary hearing that Defendant clearly understood the appellate waiver provisions and for this reason did not ask Wragg if he wished to file an appeal.  His testimony was as follows:

> MS. COGGINS:  Do you recall Mr. Wragg telling you to file an appeal?
>
> MR. MANCANO:  I don't. I don't recall that.
>
> MS. COGGINS:  Did you ask Mr. Wragg if he wished to file an appeal?

> MR. MANCANO:  I did not because there were two appellate waivers which were in writing and which were confirmed under oath on the record.
>
> MS. COGGINS: So with that in mind, what is it that you discussed with Mr. Wragg in these several conversations that you had with him after the sentencing?
>
> MR. MANCANO: You know, I don't -- I don't remember exactly, but I know we had some conversations afterwards. I just don't remember what we talked about.
>
> MS. COGGINS:  Well, typically would you agree with me that conversations that you have with a client after the sentencing revolve either around post sentence motions, rule 29 or an appeal; correct?
>
> MR. MANCANO:  Well, I don't think anything's typical. I think it depends on the circumstances of the case so I wouldn't agree with you that it's typical. Those are certainly topics that do come up in certain cases, but this was a case where there were clear appellate waivers. I had no question in my mind that he understood them, and, you know, he had waived his appellate rights under these under these plea agreements.

(Doc. No. 400 at 34-35.)  Mancano's testimony here made clear that Defendant was fully aware of the effect of his appellate waiver.

Defendant's wife, Megan Hallet, testified that based on Mancano's advice, her request to appeal was withdrawn.  She said that after Defendant's sentence was announced she told Mancano: "[Defendant's sentence] is clearly absurd and unacceptable we have to appeal this" and that Mancano advised not to.  (Id. at 78:21-22.)  She stated that at that point "under the advice of our legal counsel at the time," she trusted Mancano's experience and advice.  (Id. at 79:14-23.) Mancano testified regarding this conversation as follows:

> MS. COGGINS: Did you have a conversation immediately after [Defendant's sentencing] with Ms. Hallett? Ms. Megan Hallett?
>
> MR. MANCANO: Immediately after that?
>
> MS. COGGINS: Yes.

> MR. MANCANO: I don't recall.
>
> MS. COGGINS: In the hallway?
>
> MR. MANCANO: Perhaps.
>
> MS. COGGINS: Do you recall Ms. Hallett telling you that she was shocked and requesting that you file an appeal?
>
> MR. MANCANO: She may have said she was shocked. As far as an appeal, we had two plea agreements which contained appellant waivers and he had under oath waived his appellate rights twice, so he had no right to appeal. If she had asked I would have said that.
>
> MS. COGGINS: So my question is, did she request that you file an appeal?
>
> MR. MANCANO: I don't recall.

(Doc. No. 400 at 33:21-34:12.)  Although there might be some dichotomy in their testimony, both Mancano's and Hallet's testimony show that a decision was made that no Notice of Appeal would be filed based on the advice of counsel, and this advice was accepted by her.

The only testimony at the evidentiary hearing that Mancano was directed to file a Notice of Appeal came from Defendant, whom the Court does not find credible.  Defendant has demonstrated a lack of credibility through inconsistencies and contradictions.  First, Defendant defrauded numerous persons based upon misrepresentations, compounded by his committing an additional fraud while on pretrial release.  Second, during the July 25, 2023 evidentiary hearing, Defendant testified that on March 2, 2017, when he signed the guilty plea colloquy waiving his right to appeal, he "was definitely under the influence [of alcohol and pain medication] without question."  (Doc. No. 400 at 52:16-20.)  This statement is diametrically opposed to Defendant's response when asked about his state of mind on the day of the plea colloquy, as quoted above. (See Doc. No. 130 at 7:10-25.)  Third, when asked why he did not file a pro se appeal at the evidentiary hearing, Defendant testified that he is "a beginner in the legal system [and] had no idea

what was going on." (Doc. No. 400 at 47:4-6.)  But Defendant later testified confidently at the hearing that "one of the very first things I mentioned was that I was under the impression that the statute of limitations was five years" concerning the charges.  (<u>Id.</u> at 50:8-10.)  His focus on the statute of limitations belies his claim of being a novice about the legal system.  Further, when asked whether he requested that Mr. Mancano look into the retroactive effect of the Dodd-Frank Act, Defendant said, "Absolutely," without asking for clarification. (<u>Id.</u> at 50:23-25.)  Again, this demonstrates that he was no novice.  Fourth, Defendant contradicts Mancano, a lawyer with extensive experience in federal criminal cases, as to whether Defendant wanted to fight the charges from the onset and as to whether the two met before the sentencing.  (<u>Id.</u> at 49:19-20; 58:1-2.)  The Court credits Mancano's testimony that Defendant did not "seem particularly interested in how the case would be defended" and he "made it clear that this was going to be a case for non-trial disposition." (<u>Id.</u> at 39:17-22.)  Defendant's testimony to the contrary is not credible.  (<u>Id.</u> at 49:19-20).  Defendant testified that Mancano "had falsely said that we met before sentencing. We did not." (<u>Id.</u> at 57:25-58:2)  The Court credits Mancano's testimony that such a meeting took place. (<u>Id.</u> at 30: 6-9).  A lawyer with his experience would undoubtedly meet with a client before sentencing and go over the relevant materials.

Moreover, at the same evidentiary hearing, Defendant testified that he asked Mancano to file an appeal personally and through e-mail.  Notably, Defendant has failed to introduce these alleged emails into evidence.  In addition, Defendant's sentencing took place on August 21, 2019. He waited twelve (12) months before filing his § 2255 Motion on August 3, 2020.  This nearly one-year delay undermines the credibility of Defendant's statement that shortly after sentencing he asked Mancano to file a Notice of Appeal.

In sum, although defense counsel has an obligation to file a Notice of Appeal when requested to do so by a defendant, that did not occur here.  Mancano, whom the Court does find credible, testified that Defendant was fully aware that he waived his appellate rights.  And the testimony at the evidentiary hearing confirms that even if the request was made, it was withdrawn based on Mancano's advice about the appellate waiver provisions.  Therefore, Defendant has failed to show deficient performance by his attorney, and his ineffective assistance of counsel claim based on a failure to file an appeal fails.

### 5. Failure to Object to the Loss Calculation in the Presentence Report

Fifth, and finally, Defendant argues that his counsel was ineffective because he failed to object to the loss amount in the Presentence Report.  (See Doc. Nos. 366 at 42-43; 380 at 17-19.) For reasons stated above in Section IV.B.3, counsel's failure to object to the $54 million loss as stated in the Presentence Report was neither deficient nor prejudicial.  There is no evidence supporting Defendant's assertion that the actual loss was $23 million, and the lowest figure the Court determined to be the net loss was $37 million, which still falls within the $25 million to $65 million range for a 22-level sentencing enhancement under the Sentencing Guidelines.  Therefore, Defendant's claim fails under both prongs of an ineffective assistance of counsel claim because counsel's objection would not have changed the result of sentencing.

### V. CONCLUSION

For all the reasons described above, Defendant's § 2255 Motion (Doc. No. 366) will be denied.  No certificate of appealability will be issued because Defendant has made no substantial showing of the denial of a constitutional right. An appropriate Order follows.